IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| QVC, INC. | : | CIVIL ACTION |
| | : | NO. 08-3830 |
| v. | : | |
| | : | |
| MJC AMERICA, LTD. | : | |
| d/b/a SOLEUS INTERNATIONAL, INC. | : | |
| | : | |

O'NEILL, J.                                                                                                  July 18, 2011

## MEMORANDUM

Now before me is the motion of plaintiff and counterclaim-defendant QVC for summary judgment on count II of the amended counterclaim filed by defendant and counterclaim-plaintiff MJC America, Ltd., d/b/a Soleus International, Inc. For the reasons that follow, I will grant QVC's motion.

## BACKGROUND

QVC retails a wide variety of products directly to consumers. Soleus markets and distributes consumer products including electric space heaters and other products. In late 2007, QVC purchased from Soleus approximately 28,000 units of a model number HM5-15A heater, a 360-degree micathermic heater with 3 heat settings. Am. Counterclaim ¶¶ 9-11, 14-17. Micathermic heaters rely on ground mica spread across flat electrical panels or "fins" to distribute heat evenly and efficiently. Soleus Ex. A. at 78-79. QVC asserts that it sold more than 19,100 Heaters to its retail customers between December 31, 2007 and March 11, 2008. Compl. ¶ 23; but see Answer ¶ 23.

Beginning in January 2008, customers who had purchased Heaters from QVC began to make reports that certain Heaters were emitting smoke and sparks, overheating, melting, and/or catching fire.  QVC informed Soleus of the customer complaints, provided Soleus with photographs of returned Heaters and sent Soleus two Heaters that customers had returned to QVC.  Am. Counterclaim ¶¶ 29-31.  QVC also engaged Intertek Testing Sevices to perform a failure analysis with respect to the Heaters and supplied Intertek with four returned damaged Heaters and four Heaters which were new-in-box.  QVC Ex. 8.

On or about March 17, 2008, QVC sent a letter to the U.S. Consumer Product Safety Commission reporting the customer complaints as follows, in relevant part:

> QVC has received multiple customer reports of the [Heater] smoking, sparking and overheating, and has also received reports of fire or flames coming from units.  This report applies only to heaters that QVC sold.
>
> As of March 11, 2008, QVC stopped the sale of its inventory of this product.  QVC is expeditiously investigating this matter to determine whether a recall is appropriate.  If it determines that is the case, QVC intends to participate in the Commission's Fast Track recall program.

QVC Ex. 4 at 1.  With respect to the "[n]ature and extent of possible defect," QVC stated:  QVC has received over 70 reports of heaters smoking, overheating, sparking, melting, and/or emitting odors of burning.  Nine additional customers have reported observing flames or fire coming out of or inside the heaters.  Id. at 2.  QVC reported that the "[n]ature and extent of possible risk" associated with the Heaters was "burns or house fires."  Id.

In a March 20, 2008 letter from QVC to customers who had purchased a Heater, QVC wrote that it:

> has received some customer reports of smoke or flames appearing
> within the area of the front control panel while the heater is in use.
> This could prevent a risk of fire or injury.  However, no injuries
> have been reported.  Please stop using this product immediately
> AND unplug it, even if it has been used without incident.

QVC Ex. 5.  Also on March 20, QVC sent a pre-recorded telephone message containing similar information to customers who had purchased a Heater.[1]  QVC Ex. 6.

On or about March 30, 2008, Intertek provided a final report on the Heaters to QVC. Intertek "was not able to reproduce similar failures on any of the new samples provided."  QVC Ex. 8 at 15.  However, its examination of the four customer-returned units demonstrated:

> a breakdown of insulation on electrical components.  From
> inspection of the damaged units, there is clearly shorting of live
> parts to ground and ignition of plastic which may or may not have
> caused flames to leave the enclosure. . . . There is evidence of
> combustion from the burned plastic, although it did not completely
> consume the plastic control enclosure panel. . . . From an electric
> shock point of view, there was breakdown of electrical insulation
> in high voltage circuits which could lead to a risk of electric shock.

Id.  Intertek noted that the overheating apparently originated near metal connectors that were "crimped" to the end of affected wires and observed that poor quality crimp connections could be a cause of overheating.  Id. at 14.  The report concluded that "it is possible that the cause of the failures is quality of construction related and thus an intermittent problem."  Id. at 15.

After receipt of Intertek's final report, and without first consulting with Soleus, QVC decided to recall the Heaters.  On April 2, 2008, QVC notified the CPSC that it "intend[ed] to

---

[1] The March 20, 2008 recorded telephone message sent by QVC to customers who had purchased Heaters identified the product as "the Soleus Air 360 Degree Heater that you ordered from QVC" but did not identify the QVC item number for the Heater.  Ex. 6.  Otherwise, the information contained in the telephone message was substantially the same as the information in the March 20, 2008 letter.

participate in the Commission's Fast Track recall program to recall all of the heaters QVC distributed" to its customers.[2]  QVC Ex. 9 at 1.  QVC informed the CPSC that it had "received over 70 reports of heaters smoking, overheating, sparking, melting and/or emitting odors of burning.  Nine additional customers [had] reported observing flames or fire coming out of or inside the heaters."  Id. at 3.  QVC provided the CPSC with a proposed letter to affected customers and advised the CPSC that once the CPSC approved the letter QVC would "immediately send the letter to its customers advising them to cut off the attachment cords on the heaters and to return the cords to QVC."  Id. at 1.  QVC also provided the CPSC with a proposed "Safety Recall Notice" to be displayed at QVC's retail stores.  Id. at Tab 6.

CPSC approved the recall letter and notice, QVC Ex. 10, and on April 12, 2008, QVC notified its customers that it was conducting a voluntary recall of the Heater.  QVC's letter to affected customers stated, in relevant part,

> I am writing to you today as a follow up to our recent efforts to contact you concerning the Soleus Air 360 Degree Micathermic Heater with 3 Heat Settings, item V24882, which you previously purchased from QVC.  In cooperation with the U.S. Consumer Product Safety Commission (CPSC), QVC is recalling this product because it has received customer reports that some of the heaters have smoked, sparked, overheated, or caught fire.  Although there have been no reports of injuries, we again remind you to stop using this product immediately AND unplug it, even if it has been used without incident.

QVC. Ex. 9 at Tab 5.  Customers were instructed to cut the electrical cord off at the point at which it attaches to the appliance and to return the cord and an order barcode to QVC in order to

---

[2]  Under the Fast Track recall program, the CPSC does not conduct its own investigation or make a preliminary determination as to whether a recalled product contains a defect creating a substantial product hazard.  QVC Ex. 19 at 13.

obtain a full refund of the original purchase price, applicable taxes and shipping and handling charges.  Id.  The notice was posted at QVC's outlet stores.  Id. at Tab 6.

On or about May 1, 2008, the CPSC published its own "Recall Alert" under the heading "QVC Recalls Space Heater Due to Fire Hazard."  QVC Ex. 12.  The CPSC alert identified the product recalled as "SoleusAir Space Heaters," explained that the product had been sold through QVC's television shopping programs, its website and in its retail locations and further described the recalled product in detail, noting that "[t]he words 'SoleusAir 360 Micathermic Heater' are printed on a label located on the front of the unit."  Id.  The CPSC alert noted that "[t]he unit can overheat, posing a fire hazard to consumers" and identified the reported incidents with the Heaters.  Id.

QVC commenced this action against Soleus on August 12, 2008, alleging that Soleus was in breach of its obligations to indemnify and hold QVC harmless for costs and damages arising in relevant part out of the Heater recall.  Soleus filed a two-count counterclaim against QVC.  The instant motion arises out of Count II of Soleus's counterclaim, which sets forth a claim for commercial disparagement.

## STANDARD OF REVIEW

The party moving for summary judgment has the burden of demonstrating that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  If the movant sustains its burden, the nonmovant must set forth facts demonstrating the existence of a genuine dispute.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  A dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." Id.  A fact is "material" if it might affect the outcome of the case under governing law.  Id.  The "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the movant.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978) (citations and quotation marks omitted).

To establish "that a fact cannot be or is genuinely disputed," a party must:

> (A) cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## DISCUSSION

An action for commercial disparagement "is calculated to protect against derogatory statements that affect the marketability of a party's goods or services."  Synthes (USA) v. Globus Med., Inc., No. 04-1235, 2005 WL 22233441, at *4 (E.D. Pa. Sept. 14, 2005), citing Zerpol Corp. v. DMP Corp., 561 F. Supp. 404, 408 (E.D. Pa. 1983), Restatement (Second) of Torts §

623(A), cmt. g; see also Synygy, Inc. v. Scott-Levin, Inc., 51 F. Supp. 2d 570, 579 (E.D. Pa. 1999) ("A commercial disparagement action is meant to compensate a vendor for pecuniary loss suffered because statements attacking the quality of its goods have reduced their marketability."). The publication of a disparaging statement concerning the business of another is actionable under Pennsylvania law where:

> (1) the statement is false; (2) the publisher either intends the publication to cause pecuniary loss or reasonably should recognize that publication will recognize in pecuniary loss; (3) pecuniary loss does in fact result; and (4) the publisher either knows that the statement is false or acts in reckless disregard of its truth or falsity.

Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 809 A.2d 243, 246 (Pa. 2002), citing Restatement (Second) of Torts § 623(A); see also Neurotron, Inc. v. Medica. Serv. Ass'n of Pa., Inc., 254 F.3d 444, 448-49 (3d. Cir. 2001).

Accordingly, to defeat QVC's motion for summary judgment Soleus must establish as a threshold matter that QVC made a false statement. The legal standards applicable to defamation claims – including those for determining the truth or falsity of statements – are appropriately applied in determining the sufficiency of Soleus's claim for commercial disparagement. See, e.g., Gilbert v. The Bionetics Corp., No. 98-2668, 2000 WL 807015, at *3-9 (E.D. Pa. June 6, 2000) (following standard used to determine the truth or falsity of a statement in the context of a defamation claim in finding that the plaintiffs failed to set forth evidence to demonstrate allegedly disparaging statements were untrue resulting in summary judgment for defendant on trade libel claim). The truth required to establish Soleus's claim for commercial disparagement is "substantial truth," not "complete truth." See Gilbert v. The Bionetics Corp., No. 98-2668, 2000 WL 807015 at *3-9 (E.D. Pa. June 6, 2000). Under Pennsylvania law, "proof of substantial

truth must go to the 'gist' or 'sting' of the alleged defamatory matter." Id., at *3, citing Dunlap v. Phila. Newspapers, Inc., 448 A.2d 6, 15 (Pa. Super. Ct. 1982).  In applying this standard I must decide whether the allegedly disparaging statement "would have a different effect on the mind of the reader from that which the pleaded truth would have produced." Gilbert, 2000 WL 807015 at *3.

On their face, QVC's various statements about the Heaters were not untrue.  With respect to the March 17, 2008 letter to the CPSC, Soleus's designee[3] admitted that Soleus "does not contend" that the statements in the letter were false.  QVC Ex. 13 at 151:15-152:17, 152:24-153:14.  Asked whether the identified "possible risk" of "possible burns or house fires" was false, he demurred, asserting instead that the risk was instead "not likely." Id.  Asked about the truth of QVC's statement in the letter that it had "received over 70 reports of heaters smoking, overheating, sparking, melting and or/emitting odors of burning [and that n]ine additional customers have reported observing flames or fire coming out of or inside the heaters," he answered that he did not contend that the statement was false.  Id. at 154:7-14.

When asked about the statement contained in QVC's March 20, 2008 letter to Heater purchasers, Soleus's corporate designee testified as follows:

> Q. I understand your testimony to be that you cannot identify a false statement in either of these two pages of this exhibit.
>
> A. Okay.
>
> Q. Because so far you have not identified anything that is a false statement; am I correct?

---

[3] The testimony of Soleus's corporate designee is binding on Soleus.  Fed. R. Civ. P. 30(b)(6).

> A. I still think about the flame part I do not have anything verified that the heater can be flammable.
>
> Q. Well, this doesn't say that the heater is flammable. This says that QVC has received reports of smoke with flames appearing within the are of the front control panel while the heater is in use. Are you contending that that is a false statement?
>
> A. No.
>
> Q. The next sentence says, "This could present a risk of fire or injury." Do you contend that that is a false statement?
>
> A. I say – okay. This associate [sic] previous sentence. If previous sentence is true, yes, it could cause a risk of fire or injury. Without verification of the fact and merely based on reporting – reported or some customer say something, I think it's a premature action to send out message like that.

QVC Ex. 13 at 50:23-51:22. Soleus's apparent disagreement with QVC's decision to notify Heater purchases of customer complaints does not render false the information contained in the March 20, 2008 letter.

In support of its argument that QVC made false statements about the Heaters, Soleus directs the Court's attention to "the several statements that the recall was 'DUE TO FIRE HAZARD.'" Soleus Br. at 17. However, of the two documents cited by Soleus one was the CPSC's Recall Alert. QVC Ex. 12. Although initially drafted by QVC, QVC Ex. 9 at 5 and Ex. 9 at Tab 7, I will not attribute the CPSC's revised statement to QVC for purposes of establishing Soleus's claim for commercial disparagement. See QVC Ex. 13 at 165:6-165:9 ("Q: And you understand that this document [the May 1, 2008 Recall Alert], is a publication of the United

States Government, correct? A. Yes.").[4]

The second document cited by Soleus, QVC's April 2, 2008 letter to the CPSC, does not ever explicitly state that the recall was "due to fire hazard." Instead, it identifies customer reports of smoking, overheating, sparking, melting, burning odors, flames and/or fire from the Heaters and states that "[i]f the heater catches fire, it <u>could</u> ignite nearby combustibles, resulting in burns." QVC Ex. 9 at 3 (emphasis added). When asked whether he contended that QVC's characterization of the customer reports was false, Soleus's corporate designee answered "No." QVC Ex. 13 at 154:2-14. When asked whether QVC's statement that "[i]f the heater catches fire, it could ignite nearby combustibles resulting in burns" was a false statement, he testified as follows:

> A. Yes. I think by design the heater would not catch fire.
>
> Q. That statement does not say that the heater will catch fire, correct? It says if the heater catches fire it could ignite nearby combustibles.
>
> A. But it's implied that the heater could catch fire.
>
> Q. And you object to the implication that the heater would catch fire, correct?
>
> A. Yes.

QVC Ex. 13 at 154:15-156:7.

Soleus thus argues that QVC's statements, even if literally true, are false in context, noting that "the literal accuracy of separate statements will not render a communication true where . . . the implication of the communication as a whole was false." Soleus Br. at 19, citing Capozzi v. Lucas, No. 03-811, 2004 WL 5572908, at *9 (M.D. Pa. Aug, 25, 2004). I do not

---

[4] Although QVC's draft bore the same headline as the CPSC's recall alert, the body of QVC's draft identified the hazard only as a "[p]ossible fire hazard," QVC Ex. 12.

agree that QVC's statements may be construed as false when read as a whole. First, QVC's statements do not imply that all of the Heaters QVC sold were defective. Instead, they plainly advised both customers who had purchased Heaters and the CPSC that customers had identified problems with a subset of the purchased Heaters: it "received *some* customer reports," QVC Exs. 5, 6, or "over 70 reports of heaters smoking, overheating, sparking, melting, and/or emitting odors of burning [and n]ine additional customers have reported observing flames or fire coming out of or inside the heaters." QVC Ex. 4 at 2, Ex. 9 at 3. Second, QVC's statements do not imply that the affected Heaters were in fact hazardous. Instead, they reported a "possible" risk, QVC Ex. 4 at 2, Ex. 9 at 3, Ex. 9 at Tab 6, "potential safety risks," Ex. 9 at tab 5, or stated that the heaters "could pose a risk," QVC Exs. 5, 6.

     Soleus also contends that when viewed in their entirety QVC's statements are false in that they imply a "sweeping disparagement of the entire line of SoleusAir 30 Degree Micathermic Heater[s]." Soleus Br. at 20-21. Again, I disagree. In its March 17, 2008 report to the CPSC, QVC noted that the letter "applie[d] only to heaters that QVC sold." QVC Ex. 4 at 1. QVC's April 2, 2008 letter to the CPSC initiating QVC's participation in the Fast Track recall program clearly limits the scope of the recall to "the heaters QVC distributed." QVC Ex. 9 at 1. Each of QVC's written communications were expressly limited to the Heaters, each identifying the full name of the Heater – the Soleus Air 360 Degree Micathermic Heater with 3 Heat Settings – and the QVC item number – V24884. QVC Ex. 4 at 1, 5, Ex. 9 at 3.

     Soleus's dissatisfaction with QVC's investigation of the reported complaints about the Heaters, its disagreement with QVC's determination to recall the Heaters and its disapproval of the process QVC used to conduct the recall cannot serve as the basis for the claim set forth in

Count II of its counterclaim. See Neutotron Inc. v. Med. Serv. Ass'n of Pa., Inc., 254 F.3d 444, 452-53 (3d Cir. 2001) (finding that where defendant had a rational basis for allegedly disparaging statements, plaintiff's "legitimate criticisms of the statement and of the process by which it came to be made" were not sufficient to support plaintiff's claim for commercial disparagement). Absent evidence of a statement which is either literally false or false in context, Soleus has not met its burden to support its claim for commercial disparagement.

## CONCLUSION

Because Soleus has not as a matter of law established that QVC made any false statement regarding the Heaters, I find that Soleus has failed to meet its summary judgment burden.[5]

An appropriate Order follows.

---

[5] Given this conclusion, I need not address QVC's alternative arguments that it did not intend its statements to cause a pecuniary loss to Soleus, that its statements did not cause pecuniary loss to Soleus, that it did not act with reckless disregard for the truth or falsity of its statements, and that it was privileged in making the statements.