IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| QVC, INC. | : | CIVIL ACTION |
| | : | NO. 08-3830 |
| v. | : | |
| | : | |
| MJC AMERICA, LTD. | : | |
| d/b/a SOLEUS INTERNATIONAL, INC. | : | |
| | : | |

O'NEILL, J.                                                          October 22, 2012

**MEMORANDUM**

　　　　Plaintiff and counterclaim-defendant QVC, Inc. brings an action for breach of contract

seeking declaratory relief, equitable relief and damages against its vendor, defendant and

counterclaim-plaintiff MJC America, Ltd., d/b/a Soleus International, Inc.  Soleus has asserted a

counterclaim for breach of contract against QVC.  The parties' claims against each other arise out

of QVC's purchase from Soleus of electric space heaters and other items in 2007 and early 2008

and QVC's subsequent recall of certain of those space heaters.  QVC contends that it reasonably

determined that the recalled heaters were defective, that Soleus breached its purchase order

contracts with QVC and that as a result of Soleus's breach QVC is entitled to damages from

Soleus, including the costs attendant to the recall of the heaters.  Soleus contends that QVC did

not make a reasonable determination that the recalled heaters were defective and that "QVC's

conduct during the investigation and recall violated QVC's duties of good faith and fair dealing

under the contract."  Dkt. No. 93 at 2.

　　　　A bench trial was held from January 9 to January 13, 2012.  The parties submitted their

post-trial briefs including proposed findings of fact and conclusions of law on March 12, 2012.

Pursuant to Federal Rule of Civil Procedure 52(a) and after review of the evidence presented and

applicable law, I make the following findings of fact and conclusions of law.

**FINDINGS OF FACT**

## I.     The Parties

QVC, a retailer, markets and sells merchandise directly to consumers through various media including direct response television programming and the internet.  Jt. Stip. ¶ 1.  "Soleus is in the business of promoting, marketing, distributing and selling home comfort products, including portable air conditioners, heaters, air purifiers, fans and coolers under the trade names of 'Soleus,' 'SoleusAir' and variations thereof."  Id. ¶ 2.  QVC sold Soleus products to its retail customers.  Id. ¶ 6.

## II.    The Heaters

Purchase Order 550957, issued by QVC to Soleus on or about August 31, 2007 and subsequently revised on September 13, 2007 and October 9, 2007, required Soleus to provide QVC with 27,000 units of a SoleusAir 360-Degree Micathermic Heater with Three-Heat Settings further identified as QVC SKN V24882 (the "Heater").  Id. ¶ 3.  Purchase Order 567520, issued on or about January 4, 2008 and subsequently revised on January 7[1], January 8, and January 10, required Soleus to provide QVC with 1,056 additional Heaters.  Id. ¶ 4.

The Heaters were manufactured in China by Ningbo Bole Electric Appliance Co., Ltd. Id. ¶ 7.  They were cylindrical, portable electric space heaters designed and intended to stand on the floor.  See P-154 at 5.  The Heaters were equipped with manual, not digital, control panels and the manual version was sold exclusively in the United States by and through QVC.  Jt. Stip. ¶ 8.  They had an interior metal wall housing a micathermic heating element.  Each Heater's

---

[1]          All dates referred to without a year designation are from 2008.

electric wiring, circuit board and thermostat were mounted on a combination of metal and plastic surfaces in a compartment outside of the interior wall.  See P-154.

QVC promoted and marketed the Heaters for sale to its customers beginning on December 31, 2007, when they were featured as a Today's Special Value® on QVC's live television programming and on QVC's related website.  Jt. Stip. ¶ 18; Tr. Day 1 at 106:4-8 (McGrath).  QVC sold more than 19,100 Heaters to its retail customers between December 31, 2007 and March 11, 2008.  Jt. Stip. ¶ 19.  Most of the Heaters were sold on December 31, 2007 and in January 2008.  Tr. Day 2 at 13:18-19 (Fitzgerald).

III.    **Customer Complaints and the Parties' Responses to the Complaints**

On January 5, 2008, a customer contacted QVC claiming that the Heater he or she had purchased "has a gas odor to it and [is] very hot to touch."[2]  P-62 at QVC-01-00073.  On January 8, a customer claimed that the "Heater went up in sparks out of top."  Id.  Another customer reported a "burning smell."  Id. at QVC-01-00074.  On January 9, QVC received a complaint of "smoking smelled bad/tried again and blew fuse in home 2x."  Id. at QVC-01-00077.  On January 10, a customer reported that their Heater "had a nocious order [sic] and set off their smoke detector."  Id. at QVC-01-00073.  Subsequent customer calls recorded by QVC included a January 28 report that a Heater was "smoking and flames shot out top of unit," id. at QVC-01-0076, and a January 29 report that a Heater "caught on fire. around knob – wires all melted."  Id. at QVC-01-0073.  By late January, QVC had received 80-100 similar complaints regarding fire,

_____

[2]        On January 6, 2012, I found that "evidence of the customer complaints is admissible to demonstrate that QVC had notice that certain of its customers had logged complaints pertaining to the performance of the heaters and an awareness of the possibility that the heaters were defective prior to making its determination that a recall of the heaters was necessary."  Dkt. No. 75 at 5.

sparks, odor or smoke from the Heaters.  Tr. Day 1 at 19:2-9 (McDermott); see also P-62 (customer contact log).  "[O]f particular note were a number of customer complaints in which they indicated that they had seen flames in the unit and that the unit had melted around the control panel, that the plastic facing of the cover of the control panel was warped or melted."  Tr. Day 1 at 93:17-24 (McGrath).  Due to the number of Health and Safety related complaints pertaining to the Heaters, the complaints became a concern of QVC's Office of the President ("OOP").  Tr. Day 1 at 24:16-25:12 (McDermott); P-57.  The OOP reviews and investigates health and safety concerns raised by QVC customers.  Tr. Day 1 at 17:3-18:21 (McDermott).

Soleus's designated contact for the Heaters was Gary Mickles, "an intermediary between [QVC] and Soleus."  Tr. Day 1 at 63:24-64:12 (Fitzgerald).  Mickles was an independent contractor for Coleman and Hirshman, a sales organization that represented Soleus's products through Epic International, an independent contractor sales representative for Soleus.  Mickles Dep. at 8:20-9:15.

On February 1, Tom Kluxen, identified as a QVC "Buyer" for "Home Improvement, Household, Cleaning and Storage" forwarded to Mickles a January 31 email from Shawn Fitzgerald, a Senior Engineer for Quality Assurance at QVC.  P-27.  Fitzgerald was charged with investigating the Heaters and the customer complaints.  Tr. Day 1 at 52:14-20 (Fitzgerald), id. at 93:25-94:3 (McGrath).  Fitzgerald's email noted that "QVC's call rate [for the Heaters] is climbing high with several claims of 'fire.'"  P-27.  Kluxen asked Mickles to "[p]lease alert Soleus about this concern about this and let us know if they have had any calls/concerns."  Id. Kluxen noted that QVC's quality assurance "department [wa]s going to evaluate a few of these customer returns."  Id.

-4-

Fitzgerald asked the OOP if he could get some Heaters back for evaluation.  Tr. Day 1 at 55:17-56:1 (Fitzgerald); P-27.  On January 31, the manager of the OOP responded to Fitzgerald's request by email, stating that "1 came back today and Dolores is shipping it over to you."  P-25; Tr. Day 1 at 75:23-24 (Fitzgerald).  When Fitzgerald visually inspected the first customer-returned Heaters he received from the OOP he observed

> signs of soot, which indicates . . . something either burned or charred and let smoke out the vents, melting of the control panel, warping of the plastic in the immediate area around the control panel, and then once [he] began to disassemble- the unit, there were [sic] – one wire in particular, in various stages of failure. And by failure, it appeared to be an over-temperature condition where the wire was burning the wire sleeving, which is the rubber insulation on the outside of the wire, was blistered off or completely charred off, and in one case, the wire was severed, you know, from over-temperature.

Tr. Day 1 at 58:3-13 (Fitzgerald).

By February 8, Fitzgerald had inspected and photographed three customer return Heaters. P-30.[3]  That day, Fitzgerald emailed Mickles "word documents with photos included for the three customer return units," noting that "[t]he failure mode seems to be common among the three units.  The same wire is at various stages of failure in the [sic] each of the three units."  P-30. The attached photographs included photographs of the serial numbers for each of the referenced Heaters.  Id.  Fitzgerald asked Mickles to "[p]lease advise what the next steps should be" and noted that "there have been 100 calls reporting some nature of "Health and Safety incidence."  Id.

Later that day, Kluxen emailed Mickles, stating that

> Shawn from [Quality Assurance] will likely be contacting you

---

[3]     Fitzgerald ultimately received eight customer-returned Heaters from the OOP for evaluation.  Tr. Day 1 at 56:15-17 (Fitzgerald).

> shortly if he hasn't already to discuss the findings of the heater
> returns.  I did see a few today that did have small electrical fires in
> them.  Pls [sic] have the production units put on hold for the black
> until you get confirmation from qvc.  To ship.  I hope this isn't a
> recall issue.

P-32.  Mickles responded to Kluxen by email, noting that he had "informed Soleus of a potential

problem, and of course stopped production for the units you wanted." P-33.  Mickles added, "I

think everyone out there is heading into Chinese New Year, and they will be on top of this when

they get back."  Id.

On February 11, Mickles visited Fitzgerald at QVC to discuss and inspect certain of the

damaged Heaters.  Tr. Day 1 at 72:6-11 (Fitzgerald).  At the end of their meeting, Fitzgerald gave

Mickles two of the customer-returned Heaters and asked him to send them to Soleus for

examination.  Id. at 73:20-22; Mickles Dep. at 53:23-54:3.  Mickles "sent them right to Soleus."

Mickles Dep. at 54:17-18.  Also on February 11, Gino Aiello[4] sent an email to Charley Loh,

Soleus's Chief Executive Officer, C. Loh. Dep. at 6:18-23, explaining that "Gary met with QVC

quality control today on a serious issue with [the Heaters].  It appears that they have received

several back that have either caught fire or got hot enough to melt the wires inside." P-36.

Aiello went on to say that "[w]e need to inspect these and come up with a reason for this issue, or

we could face the real possibility of QVC issuing a recall on these."  Id.  Charley Loh responded

that day explaining, "[t]his is the first time I hear [sic] it catch on fire on this item . . . .  I have

read all the reviews 10 days ago for QVC and there is to [sic] one case mentioned catching on

fire."  Id.

---

[4]      Aiello was the "East Coast sales manager" for Epic International.  Tr. Day 3 at
122:7-16 (Scott).

On February 12, QVC offered to send Mickles or Soleus another customer-returned Heater "with the same wire burnt behind the control panel." P-37. Responding by email on February 13, Mickles told Fitzgerald that the other Heaters had arrived at Soleus and asked QVC to keep the additional unit QVC had until Mickles knew more. P-40.

On February 14, Mickles sent Fitzgerald a document regarding the "Burnt wires factory evaluation." P-42. It included an initial evaluation of the Heaters based on photo images of two Heaters with melted wires from the Ningbo Bole factory in China. Citing "oxidation (rusting) on a surrounding metal trim" on one unit "which can only be caused from contact with water or sodium" and, on the other unit, "grease or oil content found near the burnt wires which would suggest foreign debris entering the circuitry," the document concluded that "the factory suspects that these units were either used under non-residential environment [sic] or advertently tempered [sic] by foreign substance." P-41.

Fitzgerald responded to the factory's conclusions in a February 14 email to Mickles noting that he had "a hard time believing the conclusions for the burnt wires giving [sic] they are not isolated incidents. It seems more epidemic than random foreign material getting into the control panel since there are a large quantity of failures." P-43. Mickles forwarded Fitzgerald's response to Soleus and asked whether Soleus "would like me to have QVC send the additional burned units to you." P-44. There is no immediate response from Soleus to Mickles' inquiry in the record.

On February 22, Mickles emailed Tyler Scott[5] with a copy to Aiello noting that "if we

---

[5]     Epic International is Scott's company. Mickles Dep. at 9:2-12. In his role at Epic, Scott represented Soleus as an "outsource sales, sales marketing man." Tr. Day 3 at 121:25-122:4 (Scott).

don't do something soon, the QVC Legal Department will be breathing down yours and Charl[ey Loh's] throat." P-45. He added, "[p]lease let me know if you have heard anything back from China since you sent the two fire damaged Heaters back. They need answers now." Id.

On February 25, Scott sent Mickles an email with a copy to Aiello with Soleus's "initial findings regarding QVC's melting issue of the HM5" after its initial inspection of the returned units received from QVC. P-46 at 5. Soleus's conclusion was that "the melting problem appears to be in this rare incident and only on product that was used improperly. Most importantly, it does not appear to be a fire hazard." P-47 at 2. Scott explained that "[t]he melting is still considered very serious by us, thus we have shipped [the samples that were returned to QVC and then to Soleus] to China for a thorough evaluation." Id. Mickles responded to Scott's email that day, explaining that "QVC has many more units with the same problem, and they want me to pick them up this week." P-48. Further, QVC "seem[s] to feel that this was not an isolated incident, rather an Epidemic in regard to the units overheating and melting wires inside. The return rate for this product is approaching 20%." Id.

Also on February 25, in response to Scott's email, Mickles sent an email to Aiello asking whether anyone had seen "what Shawn [Fitzgerald] wrote back to us when we gave him that bullshit about water and grease getting into the units I sent back?" P-47. Mickles noted his concern that Soleus would be "forced into a 100% recall of this item." Id. He also asked whether "Soleus ha[d] Lot numbers for product manufactured," noting that "[i]f they do, we can talk about a small amount produced in a lot, and therefor convince them that it can be isolated." Id.

Although Mickles' emailed question about lot numbers raised the issue with Soleus of

whether a potential recall could be limited in scope, neither Mickles nor anyone else connected to Soleus ever "raise[d] the question or the issue of whether the defect or potential defect could be segregated to a particular manufacturing lot" with QVC during QVC's investigation of the Heaters and the cause of the customer complaints.  Tr. Day 1 at 104:25-105:9 (McGrath); see also id. at 149:22-150:1 (Fitzgerald) ("Q. Did Soleus ever ask you in the period of time, February 2008, whether there were lot numbers for the product manufactured?  A. They never, regardless of the month or year, asked us for lot series or a serial number.  Q. Did Soleus ever suggest to you in the period of time, February 2008, that there was a potential to talk about a small amount produced in a particular lot of these heaters?  A. No."); Tr. Day 3 at 43:18-23 (Scott) ("Q. Did you ever tell QVC –- suggest to QVC, QVC, that there were lots which could be identified for a particular wiring problem so that the problem could be isolated or limited? . . . A. I did not pass that information, no.").

On February 27, at a meeting with QVC, Mickles gave QVC Soleus's initial findings.  P-53; Tr. Day 1 at 85:14-22, 87:16-19 (Fitzgerald).  Fitzgerald was dissatisfied with the initial findings, noting at trial that "given the volume of complaints that we had and the failures that we were seeing, to state that the product had been used in the rain, or someone repeatedly poured water onto it, causing it to catch on fire, was beyond comprehension for me."  Tr. Day 1 at 89:4-9 (Fitzgerald).  At their meeting, QVC told Mickles that QVC had received "more complaints and under [United States Consumer Product Safety Commission] guidelines they [were] required to report a certain amount of complaints."  Mickles Dep. at 80:15-24.

On February 28, Aiello emailed Scott, explaining that during Mickles's meeting with QVC, QVC was looking for a reason from Soleus "for the wires melting."  P-52; D-10.  Aiello

explained that the CPSC would require a retailer "receiv[ing] significant complaints on an item that could be a hazard to a consumer" to report the complaints to the CPSC.  Id.  Aiello also noted that "QVC wants to avoid this and they have empathy for our position, which is why they want us to come up with an explanation, so they can avoid having to report[ ] this to CPSC."  Id. Scott forwarded Aiello's email to Charley Loh, explaining that

> QVC is getting scared that they are going to have to call CPSC and file a recall on [the Heaters].  They need an official response from us on why the wire are [sic] melting.  They have more complaints than just the 2 so we have to come up with a better explanation.
>
> Need ASAP so they don't file a recall on our product with CPSC.

Id.

On February 29, Scott emailed Fitzgerald a one page "Factory Evaluation of HM5s with melting damage."  P-55.  The document purported to be Soleus's "final report" conducted after the Ningbo Bole factory reviewed and tested the two damaged customer-returned Heaters that Fitzgerald had given to Mickles.  The document concluded that:

> There was oxidation (rusting) on a surrounding metal trim on one damaged unit.  It could be caused by water directly drop [sic] on the wire connectors, causing short in circuit.  The wiring was melt [sic] as a result.
>
> The other damaged HM5's wire remains intact.  The insulation melted off.  Upon closer inspection, there was grease or oil content found near the burnt wires.  It could be caused by the ignition of grease or oil which resulted [sic] melting down the insulation of wire.  The factory conducted extensive testing trying to simulate possible causes of melting.  Under the following circumstances the heater case could be damaged with melting:
>
> > 1. The top of heater is covered by a wet towel or other material.

> 2.  Foreign substances such as water or oil enter into
> the control box.
>
> 3.  The wire connectors got damaged (could be
> caused by high vibration or units being dropped)[.]
>
> The test affirmed that even for the unit exhibits melting [sic], it
> will not catch fire as 1) Anti-Flaming material is used and 2) Auto
> shut off devise [sic] will activate to cut off the power supply when
> excessive heat is detected.

Id.  In forwarding the Factory Evaluation to QVC, Scott explained that "[t]he good news is that

the factory confirmed what our initial findings were, that this is not a fire hazard." Id. (emphasis

in original).  He also noted that it was "reasonable to assume that this small percentage of

customers may have used this heater improperly." Id.

Fitzgerald forwarded Soleus's report to Tom Long, id., who was QVC's Director of

Quality Assurance.  Tr. Day 1 at 64:20-21 (Fitzgerald).  Fitzgerald reacted to the conclusions in

the Final Factory Evaluation by explaining that he was "skeptical that two different cases of

customer misuse result in the exact same wire catching fire." P-55.  McGrath, who was QVC's

Vice President of Quality Assurance and Quality Control at the time, Tr. Day 1 at 90:20-25

(McGrath), explained that the report "led me to think that Soleus was not viewing this with the

same gravity as we were in terms of the potential impact that this could have to a customer in a

household use." Id. at 100:20-23.

## IV.   QVC Sends Heaters to Intertek for Evaluation

Sometime in or around the second week of March, QVC had an internal meeting to

discuss the Heaters.  Tr. Day 1 at 26:19-27:8 (McDermott).  QVC decided it would make the

Heaters unavailable for purchase so that it "could take a further investigation." Id. at 26:24-

27:15.  Because QVC "didn't have confidence in Soleus's testing and the thoroughness of the review that would be done on the evaluation of the Heaters," Tr. Day 1 at 101:5-13 (McGrath), it felt that it "needed to take a more robust physical analysis of the units" and decided to engage Intertek, an independent testing company to look at the Heaters.  Id. at 128:20-21.  On March 14, Intertek sent a proposal to QVC for a "constructional review of 2 damaged [Heaters] and a review of a new unit."  P-65.  Intertek proposed to "perform basic tests to characterize the unit and try some actual failure modes test to determine if the product fails or results in a hazardous condition."  Id.

Scott testified that as a result of conversations directly with QVC and dialogue about the Heaters, he knew that QVC planned to send two units to Intertek for testing.  Tr. Day 4 at 10:15-25 (Scott).  From the record at trial, it appears that although the sales middlemen for the Heaters may have known about QVC's plans to have Intertek examine certain Heaters, Soleus was not made aware of QVC's arrangements with Intertek.

QVC ultimately supplied Intertek with four customer-returned damaged Heaters and four new Heaters.  P-168, ¶ 26.  On March 18, Fitzgerald emailed Steven Hartquist, Intertek's general manager for retail/home appliances and electronics, with details about the history of the four used Heaters.  P-94.  The following day Fitzgerald emailed Hartquist again and asked whether there was "any chance that [QVC] can get a verbal update on Thursday?"  Id.  He posed a number of questions to Hartquist and explained that his "management [was] pressing [him] for some clarity since [QVC] was deciding a recall based on [Intertek's] findings."  Id.

On March 31, Intertek provided to QVC a draft report on the Heaters.  Id.  The draft report concluded that with respect to any burning or melting of plastic it "seemed to occur from

an overheating condition on conductors or terminal connectors," and "a possible cause would be

increased amperage and resulting temperatures from a poor quality crimp connection." Id. at

QVC-03-00212.  Also on March 31, Hartquist sent an email to Fitzgerald responding to

Fitzgerald's questions.  P-96.  Hartquist explained that "[t]here is clearly a breakdown of

insulation on electrical components which make the units non-compliant with safety standards,

and from inspection of the damaged units; there is clearly shorting of live parts to ground,

ignition of plastic which may or may not have left the enclosure."  Id.

On April 1, Intertek sent QVC a finalized version of the report regarding the Heaters.  Jt.

Stip. ¶ 32; P-98.  In the report, Intertek explained that it "was not able to reproduce similar

failures on any of the new samples provided."  D-22 at 15.  However, its examination of the four

customer-returned units demonstrated:

> a breakdown of insulation on electrical components.  From
> inspection of the damaged units, there is clearly shorting of live
> parts to ground and ignition of plastic which may or may not have
> caused flames to leave the enclosure. . . . There is evidence of
> combustion from the burned plastic, although it did not completely
> consume the plastic control enclosure panel. . . . From an electric
> shock point of view, there was breakdown of electrical insulation
> in high voltage circuits which could lead to a risk of electric shock.

Id.  Intertek noted that the overheating apparently originated near metal connectors that were

"crimped" to the end of affected wires and observed that poor quality crimp connections could be

a cause of overheating.  Id. at 14.  The report concluded that "it is possible that the cause of the

failures is quality of construction related and thus an intermittent problem."  Id. at 15.

Although Jimmy Loh, Soleus's chief financial officer, Tr. Day 4 at 60:23-24 (J. Loh),

testified that he did not see the Intertek report until after this action had been filed, id. at 89:8-10,

Scott testified that he remembered viewing the results of the Intertek testing.  Tr. Day 4 at 12:7-13:12 (Scott).

**V.     Events Leading to the Heater Recall**

At QVC's meeting in early March, before QVC retained Intertek, in addition to discussing the need for further investigation of the Heaters, QVC also discussed the possibility that the Heaters might be subject to a recall.  Tr. Day 1 at 27:16-18 (McDermott).  On March 10, QVC put all Soleus items "on hold" pending resolution of QVC's concerns about the Heaters.  P-58.

Also on March 10, having learned of the hold, Mickles informed Aiello that QVC would not accept any additional products from Soleus.  P-59.  Aiello asked Mickles, "[w]hat is it that they want for a resolution?  We have not found any significant manufacturing defect."  Id.  Mickles emailed Long at QVC and asked him to let Soleus know what QVC needed in order to resolve the issue with the Heaters.  Id.  Long replied by asking for the results of factory run testing performed on the Heaters at Ningbo Bole.  Id.  Soleus did not provide QVC with factory run test results.  P-169, J. Loh Dep. at 107:23-107:25; Tr. Day 1 at 156:19-21 (Fitzgerald); Tr. Day 2 at 5:19-21 (Fitzgerald).

On March 12, Dan Feiner, in-house counsel for QVC forwarded a copy of QVC's customer contact log for the Heaters to Soleus and asked Soleus to "contact [him] as soon as [Soleus] ha[d] had a chance to review it."  P-61.  Feiner sent a second report of "customer contacts regarding fire, smoke, burning, melting, etc." to Soleus on March 13.  P-63.  Also on March 13, Feiner wrote a letter to Charley Loh to "provide [Soleus] with formal written notice in connection with any liability QVC may have in connection with the sale and use" of any Heaters

for which it had received a customer report "involving fire, smoke, burning and/or melting plastic controls." P-64. QVC asked Soleus to provide adequate assurances and "confirm in writing that [it would] honor its indemnification obligation set forth in the Purchase Order(s)." Id.

On March 14, Soleus acknowledged receipt of the customer-complaint logs through an attorney, Ryutaro Hirota, and requested " a copy of the proposed initial report QVC would like to make to the [CPSC]." P-66. On March 15, Charley Loh wrote to Feiner to "confirm that Soleus International Inc[. would] indemnify QVC for any claims associated with the products that Soleus International Inc[.] sold to QVC, as detailed in QVC purchased [sic] order(s)." P-68. Loh's letter did not make any reference to a potential recall or the CPSC. Id.

Before receiving the results of Intertek's testing, QVC continued to prepare for a possible recall of the Heaters. On March 17, Feiner sent Hirota "a draft of an Initial Report that we intend to file [with the CPSC] by the close of business today." P-69. In the draft letter, QVC included a statement that it "intend[ed] to work expeditiously with the vendor to determine whether corrective action is necessary." Id. Feiner also provided Hirota with contact information for Michael Gidding, QVC's outside counsel who was assisting QVC in its interactions with the CPSC. Id. Soleus did not respond immediately to Feiner's letter. Notwithstanding the absence of a response from Soleus, Gidding, on behalf of QVC, submitted a letter regarding the Heaters to the CPSC on March 17. P-70.

The letter Gidding submitted to the CPSC was edited to remove a reference to QVC's intent to work with its vendor to determine the necessity of corrective action – a reference that had been included in the draft sent to Hirota. Id. Instead, the letter stated that "QVC is

-15-

expeditiously investigating this matter to determine whether a recall is appropriate."  Id.  QVC noted a "possible problem" with the Heaters.  Id.  QVC explained that it had "received multiple customer reports of the [Heater] smoking, sparking and overheating, and ha[d] also received reports of fire or flames coming from units" and that "QVC has received over 70 reports of heaters smoking, overheating, sparking, melting, and/or emitting odors of burning.  Nine additional customers have reported observing flames or fire coming out of or inside the heaters."  Id.  QVC reported that the "[n]ature and extent of possible risk" associated with the Heaters was "burns or house fires."  Id.  The letter informed the CPSC that, if QVC determined that a recall were appropriate, "QVC intend[ed] to participate in the Commission's Fast Track recall program."  Id.

On March 19, Hirota wrote a letter to Feiner "[t]o follow up on their earlier teleconference" of that same day.  P-71.  He explained that

> based on the reports from the technical and engineering staff of the manufacturer, MJC America does not believe at this time that any alleged defects in the Soleus Air 360 Degree Micathermic Heater rise to a level which would require a recall of the product.  MJC America is in the process of conducting further investigation into the product including additional testing and the hiring of experts to analyze the product.  We will keep you appraised [sic] of the results of MJC's investigation.

Id.

On March 20, Scott sent an email to Charley Loh about a conversation that Scott had with Dennis D'Angelo, a merchandiser from QVC.  D-18; Tr. Day 4 at 5:4-19 (Scott).  D'Angelo had "mentioned [that QVC] may want to do a recall of their own."  D-18.  Scott wrote that "I told him whatever they do, we want to do with them" and that D'Angelo "was very positive and

wants to work together."  Id.  Scott noted, however, that D'Angelo knew less about "what was

going on" with the Heaters than Scott did and that D'Angelo "did not know something was sent

to CPSC."  Id.

By March 20, QVC had decided "to notify the customers that we had received complaints

and to provide them with information on the nature of those complaints and to advise them to

stop using the product temporarily.  But [QVC] did not – [it] had not decided to recall the

product at that time."  Tr. Day 1 at 103:12-16 (McGrath).  McGrath testified that

> while the Intertek testing was underway, we were continuing to
> receive samples -- not samples, but complaints, and probably
> samples as well, from customers.  And we felt at that point that it
> was appropriate to send a notification to customers to temporarily
> discontinue using the product, that we had received some
> complaints and that we were investigating them, but in the
> meantime that we wanted to inform those customers to discontinue
> using the product and that we would provide them with subsequent
> information at a later date.

Tr. Day 1 at 102:5-14 (McGrath).

Accordingly, on March 20, with the approval of the CPSC, QVC sent a letter to

customers who had purchased a Heater stating that QVC

> has received some customer reports of smoke or flames appearing
> within the area of the front control panel while the heater is in use.
> This could present a risk of fire or injury.  However, no injuries
> have been reported.  Please stop using this product immediately
> AND unplug it, even if it has been used without incident.

P-75.  At trial Dan McDermott, who was Senior Vice President of Customer Service at all

relevant times, Tr. Day 1 at 15:11-15 (McDermott), explained that "[t]he letter indicates that we

would get back to the customers within three weeks, and that's something that we normally do, is

just ask the customers to take the product out of use to allow our investigation to continue so

there is no additional damage – property damage or personal damage risk, but at this time, the decision – we did not make the decision for the recall" prior to sending the letter.  Id., 29:24-30:5.

Also on March 20, QVC sent a pre-recorded telephone message containing similar information to customers who had purchased a Heater.[6]  P-74.  The telephone messages prompted a March 21 email from Hirota to Feiner in which Hirota said that Soleus had been receiving calls from QVC customers who had purchased Heaters because they had received phone calls from QVC "instructing them to unplug the product and do not operate because QVC has received reports of sparking."  P-77.  Hirota noted that Soleus was "surprised at QVC's actions even though [Soleus] informed QVC of its efforts to investigate the alleged problems with the Soleus Heater" and expressed concern that "by instructing the purchasers not to use the product [QVC was] inducing the purchasers to return the product to QVC even if there are no problems with the product."[7]  Id.

Feiner responded to Hirota that his message came "as quite a surprise to [QVC].  For it is the first real substantive response that we have received from your client in the nearly three weeks since it has been put on notice of this potential safety issue."  P-78.  Feiner continued:

> QVC has no obligation to consult with your client regarding the

---

[6]     The March 20 recorded telephone message sent by QVC to customers who had purchased Heaters identified the product as "the Soleus Air 360 Degree Heater that you ordered from QVC" but did not identify the QVC item number for the Heater.  P-74.  Otherwise, the information contained in the telephone message was substantially the same as the information in the March 20 letter.

[7]     At trial, Jimmy Loh conceded that it was reasonable for QVC to tell its customers to stop using the Heaters pending further investigation.  Tr. Day 4 at 113:14-25; 119:11-15 (J. Loh).

> defective Soleus heaters that it sold to QVC.  However, QVC has
> made many, many efforts over the past several weeks to contact
> Soleus in an attempt to involve it in all aspects of decision-making
> regarding this matter.  Our Quality Assurance personnel have made
> several calls to Soleus' technical personnel, which calls went
> unreturned.  Our Merchandising team made several attempts to
> reach Soleus' decision-makers to discuss this issue in depth.  The
> only response they received was a message that Soleus does not
> even believe that the numerous fires, smoking, melting, etc. of a
> significant number of heaters even warrants a thorough discussion
> with QVC at this time.  Also, as you know, you and I have spoken
> several times and I indicated to you that QVC wanted to involve
> Soleus in the decision-making process.  Nearly a week passed
> before Soleus even responded through you to my inquiries, and
> even then, the answer was simply that Soleus did not believe that
> any action needed to be taken at this time, and that its
> "investigation" is ongoing.  In fact, I specifically mentioned that
> QVC would need to start to make important decisions that would
> have a financial impact on your client.  QVC still has not been told
> by Soleus the name of counsel that it has retained with respect to
> the CPSC issues.  . . . We cannot understand why Soleus claims to
> be surprised by the steps that we have taken so far in the absence of
> any type of communication from it.

Id.  Feiner explained that QVC had reported the customer complaints regarding the Heaters to the

CPSC on the advice of its CPSC counsel.  Id.  He concluded by noting that "QVC [was]

dismayed to learn that [Soleus] does not believe that customers should at least be told not to use

the product until further investigation is completed, in light of the evidence gathered to date."  Id.

        One week later, on March 28, Hirota sent an email to Feiner in which he wrote that

"[c]ontrary to your claim, Soleus has been closely working with QVC to investigate the

complaints."  P-93.  He added that "Soleus is taking very seriously the reported complaints" and

noted that "[f]urther investigation of the complaints is necessary for reported hazard [sic]."  Id.

Hirota explained that Soleus's

        general position is that sparks, odor, and even smoke are not

-19-

necessarily considered fire hazards unless an examination reveals otherwise.  If heating elements are burned out, a bright light similar to a conventional light bulb burning off can be seen (sometimes consumers will say it is fire).  An odor and smoke can be caused by foreign objects entering the heating element.  Overheating could be dangerous, but the product is equipped with three over current protectors.  Further investigation of the complaints is also necessary to determine if there is a design flaw.  Based on all information available, it is our opinion and position that our product does not create a substantial product hazard that requires a report to CPSC.

Id.  Hirota said that Soleus would "fully cooperate with the CPSC in its inquiry and investigation while [it] continue[d its] own investigation."  However, Soleus disputed "QVC's position that it was necessary to submit a voluntary report to CPSC" and claimed that "QVC's warning to all its customers advising them to stop using and unplug the heater was premature and unwarranted," noting that it was "in effect a recall action which could result in substantial financial damage to Soleus."  Id.

## VI.    QVC Decides to Recall the Heaters

On April 2, after QVC received the finalized report from Intertek, QVC notified the CPSC that it "intend[ed] to participate in the Commission's Fast Track recall program to recall all of the heaters QVC distributed" to its customers.[8]  P-99.  QVC informed the CPSC that it had "received over 70 reports of heaters smoking, overheating, sparking, melting and/or emitting odors of burning.  Nine additional customers [had] reported observing flames or fire coming out of or inside the heaters."  Id. at 3.  QVC provided the CPSC with a proposed letter to affected customers and advised the CPSC that once the CPSC approved the letter QVC would

---

[8]    Under the Fast Track recall program, the CPSC does not conduct its own investigation or make a preliminary determination as to whether a recalled product contains a defect creating a substantial product hazard.  Tr. Day 2 at 155:24-156:14 (Gidding).

"immediately send the letter to its customers advising them to cut off the attachment cords on the heaters and to return the cords to QVC." Id. at 1.

Soleus contends that "QVC never allowed Soleus to participate in any fashion with respect to the scope or conduct of the recall." Dkt. No. 93 at 15. Soleus did not, however, produce any evidence (aside from its generalized assertions that it would cooperate with the CPSC) that it asked to participate in decisionmaking about the recall process.

On April 8, QVC's outside counsel sent a letter to Charley Loh in which QVC advised Soleus that, under the terms of the Purchase Orders, QVC was rejecting or revoking acceptance of 28,056 units of the Heaters. P-103. The letter explained that "QVC has received multiple customer reports that units of the [Heaters], when used for the purpose, and in the manner intended, emitted smoke and sparks and/or overheated." Id. The letter noted that QVC had "received reports of fire or flames coming from units of the" Heaters. Id. It explained that the Heaters did "not comply with applicable safety standards" because "of unacceptable breakdown of insulation on electrical components of the [Heaters] when used in the ordinary course." Id. Further, "QVC ha[d] been compelled to cease all sales of the" Heaters. Id. QVC asked Soleus to provide QVC with return authorization information to facilitate the return of unsold and customer-returned Heaters. Id. The letter also notified Soleus that

> as [Soleus] previously [had] been made aware, the nature of the defect in the [Heaters] compelled QVC to bring this matter to the attention of the United States Consumer Product Safety Commission ("CPSC"). In addition, as a result of the above described condition of the [Heaters], QVC is commencing a "Fast Track" recall program pursuant to CPSC procedures. QVC will hold Soleus responsible for all "costs, liabilities, damages and expenses (including, but not limited to, all direct, special, incidental, exemplary and consequential damages of any kind . . .

-21-

> and reasonable attorneys' fees)" incurred by QVC in connection
> with and arising from such recall of the Merchandise.

Id.

QVC's outside counsel sent a second letter to Soleus on April 10.  In the April 10 letter,

QVC estimated that "its damages and costs in connection with the recall of the [Heaters] may

exceed $2,500,000."  P-104.  QVC explained that by Feiner's letter of March 12, it had requested

"that Soleus provide adequate assurances of both its intention and ability to indemnify and hold

QVC harmless" for damages and costs resulting from a recall of the Heaters.  Id.  In the letter,

QVC contended that in Soleus's response, Soleus had stated only that it would honor its

obligations "with respect to third party claims."  Id.  QVC asserted that "the response of Soleus

falls short of assuring compliance by Soleus of its obligations arising from QVC's rejection of

the [Heaters] and its damages and costs in connection with the recall of the [Heaters]."  Id.  QVC

wrote that it "ha[d] reasonable ground for insecurity with respect to the ability or intention of

Soleus to perform its obligations under the Purchase Orders" and demanded "adequate

assurances that [Soleus could and would] indemnify and hold QVC harmless" for all costs and

damages "arising from the defective [Heaters] and all actions (including, without limitation, the

recall actions) required to be taken by QVC as a result thereof."  Id.

CPSC approved QVC's proposed recall letter and notice, P-100, and on April 12, QVC

notified its customers that it was conducting a voluntary recall of the Heater.  QVC's letter

stated, in relevant part,

> I am writing to you today as a follow up to our recent efforts to
> contact you concerning the Soleus Air 360 Degree Micathermic
> Heater with 3 Heat Settings, item V24882, which you previously
> purchased from QVC.  In cooperation with the U.S. Consumer

> Product Safety Commission (CPSC), QVC is recalling this product
> because it has received customer reports that some of the heaters
> have smoked, sparked, overheated, or caught fire.  Although there
> have been no reports of injuries, we again remind you to stop using
> this product immediately AND unplug it, even if it has been used
> without incident.

Id.  Customers were instructed to cut the electrical cord off at the point at which it attaches to the appliance and to return the cord and an order barcode to QVC in order to obtain a full refund of the original purchase price, applicable taxes and shipping and handling charges.  Id.  Customers were instructed to dispose of the Heaters.  Id.  QVC instructed customers to return only the cords because "the unit itself would be difficult to return intact."  Tr. Day 1 at 113:16-114:5 (McGrath).  QVC wanted to make it easy for its customers to disable the Heaters and take them out of use.  Id. at 114:6-23.  QVC also believed that by requiring its customers to return only the cords, it would reduce the overall cost of the recall effort.  Id.

Also on April 12, counsel for QVC forwarded to counsel for Soleus[9] "a copy of the form of recall letter being sent to QVC's customers regarding the subject heater and a copy of the recall poster being placed in QVC retail stores."  P-108.

## VII.    Reaction to the Heater Recall

In spite of all of the previous communications about the Heaters between Soleus, its representatives and QVC, Soleus expressed surprise at QVC's decision to recall the Heaters.  On April 14, counsel for Soleus sent an email to counsel for QVC and asked "Did U.S. Consumer Product Safety Commission recommend or request a recall of the heater? . . . I was under the

---

[9]    Peter Hwu apparently replaced Hirota as counsel for Soleus sometime between March 28 and April 11, 2008, when Hwu sent a letter to outside counsel for QVC asking that all future correspondence be directed to his office.  P-106.

impression that a testing company was appointed, it tested the heater, and recommended only future modifications, not a recall." P-109. In a second email on April 14, counsel for Soleus informed counsel for QVC that Soleus had provided a return authorization to QVC for "9000+" unsold units of the Heaters and a return authorization for approximately 1300 units of unsold HM1 heaters. P-111; Jt. Stip. ¶ 36.

Also on April 14, outside counsel for QVC sent copies of the Purchase Orders for the Heaters to counsel for Soleus. P-116. In the accompanying letter, QVC noted that it continued to await a response to its request that Soleus would "indemnify and hold QVC harmless for all costs and damages arising from the ongoing recall" of the Heaters. Id.

On April 18, counsel for Soleus wrote to QVC's outside counsel. Soleus's counsel explained that "[b]ased on reports and testing of the heater, it was not reasonable for QVC to recall the heater." P-117. He noted that on March 15, 2008, Charley Loh had "confirmed that [Soleus] would honor its indemnification obligation." Id. He also explained that "based [on] the parties' prior course of dealing, Soleus has always accepted return merchandise, provided appropriate credit, and provided return merchandise authorizations." Id.

QVC filed the instant action against Soleus on August 12, 2008.

## VIII.  Post-Recall Analysis of the Heaters

Ultimately, QVC, the Ningbo Bole factory and experts for QVC and Soleus concluded that there was a problem with the wiring in certain of the Heaters. Randy Bills, testifying as an expert on behalf of QVC, examined forty-six customer returned-Heaters. Tr. Day 3 at 9:19-10:18 (Bills). Bills observed that thirty-six of the Heaters he inspected displayed damage to the salmon colored wire connecting the Heater's manual selector switch to its thermostat. Tr. Day 3

at 17:9-18:2 (Bills); P-161.  The damage appeared to be caused by overheating of the salmon

colored wire.  Id.  Daryl Ebersole, Soleus's expert, explained "that the failures of the heaters that

[he] observed [were] the result of overheating from a crimp connection" and that the crimp

connection was "a manufacturing defect" . . . .  Tr. Day 5 at 13:6-11 (Ebersole).  Huang Hui, a

general director for Ningbo Bole, Tr. Day 3 at 79:24-80:2 (Huang), testified that "there's a

problem inside the wire."  Id. at 99:11.  When asked for further detail, Huang, responding

through a translator, explained:

> A:  The molding lose the -- may cause the problem. . . .
>
> Q:  The molding may cause the problem? . . .
>
> A:  Loose.  If loose for some reason. . . .
>
> Q:  You mean the soldering --
>
> A:  Yeah, soldering.  Yeah, soldering.
>
> Q:  -- or the connection?
>
> A:  Soldering, yeah.

Id. at 101:21-102:14.  Both Bills and Ebersole agreed that the problems with the Heaters were

not the result of customer misuse.  Tr. Day 3 at 11:22-12:3 (Bills); Tr. Day 5 at 14:25-15:16

(Ebersole).

The manufacturing defect was a latent defect because, as the experts for QVC and Soleus

agreed, the crimping defect in the salmon colored wires did not affect all of the Heaters

manufactured for QVC.  Tr. Day 3 at 65:18-22 (Bills); P-154 at 1; Tr. Day 5 at 13:12-14:1

(Ebersole).  Jimmy Loh testified that "[w]ith what I know today, it appeared to be like we have a

quality problem with a batch of crimp which caused the problem."  Tr. Day 4 at 90:20-22 (J.

Loh).  QVC's customers could not have known from a visual inspection of their Heater whether

or not they had purchased a Heater with a defective crimp connection.  Tr. Day 5 13:20-14:1

(Ebersole).

The defective crimp connection caused overheating and, in some cases, combustion

within the Heaters' wiring compartments.  Tr. Day 3 at 23:7-15; 35:22-36:2; 36:25-37:9 (Bills);

Tr. Day 5 at 33:9-24 (Ebersole).  Heat damage from the loose connections could cause insulation

on the wires to burn away, Tr. Day 3 at 21:10-14 (Bills), and in some instances, "[w]hen the wire

severs, there will be a[n] electrical arc event, either by the wire separating in line, or shorting to

the metal case or another wire, and that arc will ignite the vapors that are being given off by the

loose connection, vapors from the charring of the blue terminal connectors, the insulation of the

wiring, or the heating up of the plastic."  Id. at 35:22-36:2.

The Heaters were equipped with four mechanisms designed to prevent fire:  (1) a

thermostat designed to measure ambient temperatures and cause the unit to cycle when ambient

temperatures exceeded the human comfort setting; (2) a thermal switch on the inside wall facing

the heating element; (3) a "one-time" thermal switch located on the base of the wiring

compartment; and (4) a tip-over switch.  Id. at 14:10-15:25; Tr. Day 5 at 30:17-31:4 (Ebersole).

Further, certain components of the Heaters were made of "a hard formed type of plastic that

typically don't support combustion."  Tr. Day 3 at 58:18-22 (Bills).  The safety devices, however,

did not prevent bad crimp connections from causing overheating or fire.  Id. at 35:1-11; Tr. Day 5

at 21:16-24 (Ebersole).  Nor did the flame retardant plastics.  Id. at 33:17-34:17.

IX.    **QVC's Standards for Customer Satisfaction**

Under QVC's return policy, its customers may return products for a refund within thirty

to forty-five days for any reason.  Jt. Stip. ¶ 39.  QVC has "very high" standards for customer

satisfaction.  Tr. Day 1 at 15:20-16:1 (McDermott).  The "Q" in QVC sands for "quality," it is a

factor that is important to QVC from a product differentiation standpoint, and "it was very, very

important for [QVC] just because of the nature of the business . . . that the customer had a sense

of trust in the product, that the product they were going to receive would conform to how it was

described on [television]."  Tr. Day 1 at 92:10-21 (McGrath).  McGrath testified that QVC was

"vigilant in building a quality assurance infrastructure to make sure that those customer

expectations were met."  Id. at 92:21-23.  QVC "goe[es] through an enormous quality inspection

of an item to begin with to sell an item."  Tr. Day 1 at 32:9-10 (McDermott).

      QVC has an "incredibly low" tolerance for health or safety issues.  Tr. Day 1 at 31:24-

32:3 (McDermott).  When QVC customers raise complaints about purchased products that

implicate "Health & Safety" issues – problems that could lead to personal injury or property

damage – it takes only three to five similar complaints before the issue receives additional

attention from QVC's OOP.  Tr. Day 1 at 18:22-19:1; 31:19-32:3 (McDermott).

      QVC considers carefully decisions to recall products because "[w]hen you recall an item,

there is a level of customer remorse.  They've trusted us to buy the item, that it is as described

on-air or online, and there is a negative customer impact to recall.  It is something that we wish

we never had to do."  Id. at 32:10-14.

## X.    Relevant Contract Provisions

      Each of the Purchase Orders constitutes a complete contract between QVC and Soleus.

Jt. Stip. ¶ 10.  Soleus accepted the terms of the Purchase Orders without modification by, among

other things, delivery of some or all of the Heaters and other Soleus products under each of the

Purchase Orders to QVC.  Jt. Stip. ¶ 11.

Section 3 of the relevant Purchase Orders includes a representation, warranty and

covenant by Soleus that, inter alia, the Heaters shall be "free from all defects (including latent

defects) in workmanship, material and design."  Jt. Stip. ¶ 13; P-9.  Relevant here, Section 3

provides that:

> 3.  In addition to and without prejudice to any and all other
> warranties, express or implied by law, [Soleus] represents,
> warrants and covenants to [QVC] that: . . . (c) all Merchandise
> furnished hereunder, including the production, sale, packaging,
> labeling, safety, testing, importation and transportation thereof, and
> all representations, advertising, prices and allowances, discounts or
> other benefits made, offered or authorized by [Soleus] in
> connection therewith, shall at all times comply with all applicable
> federal, state, local, industry and foreign statutes, laws, rules,
> regulations and orders, standards and guidelines (collectively,
> "Laws") . . . (f) all Merchandise furnished hereunder: shall be new,
> first quality merchandise; shall conform to all representations
> and/or specifications made by Vendor; shall conform to all
> instructions intended for customers; shall conform to the Vendor
> samples given to Buyer; shall be free from all defects (including
> latent defects) in workmanship, material and design and; shall not
> be reworked, rebuilt or refurbished merchandise[.]

Jt. Stip. ¶ 13; P-9.

Section 7 of the Purchase Orders provides QVC with a mechanism for obtaining a refund

for certain merchandise, including merchandise that was returned by QVC's customers and any

other merchandise, including unsold merchandise,[10] that failed to satisfy warranties under

---

[10]     Under Section 8 of the Purchase Orders QVC was also permitted to return for a
credit or a refund certain unsold Heaters and other merchandise up to an identified percentage of
the aggregate number of such items purchased from Soleus for any reason.  Jt. Stip. ¶ 17.
Purchase Order 550957 for the Heaters  allowed for "50% Sale or Return."  P-5.  By contrast,
Purchase Order 567520 for the Heaters allowed for "0% Sale or Return."  P-8.  I previously
found that under the plain language of Section 8, QVC had not yet triggered Soleus's obligation
to provide QVC with a refund for the Unsold Heaters under Section 8 because QVC had not

Pennsylvania law, the express warranties, representations and covenants set forth in Section 3 of

the Purchase Orders and/or QVC's quality standards.  Jt. Stip. ¶ 16 and P-9.

> Merchandise furnished hereunder which is not in compliance with the Laws this Order [sic], the Regulations or the Standards, which is returned by any of Buyer's customers for any reason, which fails to meet Buyer's quality control tests, which fails to meet Buyer's carrier's quality, drop or other tests, or which is or may be used in conjunction with merchandise furnished and rejected (or acceptance thereof revoked) under this Order or another order, may be rejected (or acceptance thereof revoked) at Buyer's option and returned to Vendor.  All expense of unpacking, examining, repacking, storing, returning and reshipping any Merchandise rejected (or acceptance of which has been revoked) as aforesaid shall be at Vendor's expense and risk.  With respect to such returned Merchandise or identical merchandise purchased under a separate purchase order, Buyer shall, at its option, receive a credit or refund equal to the average cost of amounts paid by Buyer for each item of such Merchandise, or other identical merchandise, including, without limitation, in-bound freight charges (notwithstanding contrary Freight Terms, if any, set forth on the face hereof).  In the event that Buyer shall opt to receive a refund, Vendor shall pay Buyer in immediately available funds within fifteen (15) days of Buyer's request.  Buyer reserves the right to require full refund prior to the return of Merchandise.  In the event that Buyer shall opt to receive a credit, Buyer may apply such credit toward any amounts due or which may become due to Vendor.  Vendor agrees that Merchandise rejected or returned for any reason pursuant to the terms of this Order, whether or not such rejection is disputed by Vendor, will not be resold or otherwise distributed by Vendor unless all labels or other characteristics identifying Buyer and or displaying any trade name or trademark of Buyer have been first removed.  Authorization is expressly granted to Buyer to return Merchandise without additional authorization, and Vendor hereby agrees to accept such returns even without Buyer's request for return authorization labels.  Merchandise returned or rejected by Buyer is not to be replaced by Vendor without the prior written approval of Vendor.  Vendor acknowledges that Buyer does not inspect each item at receipt of

---

returned the Unsold Heaters to Soleus.  Dkt. No. 50 at 17.  On December 13, 2011, QVC reasserted its right to return Heaters remaining in its inventory.  Jt. Stip. ¶ 38; P-128.

> Merchandise and that defects, imperfections or nonconformity with
> any representations, warranties or covenants set forth herein may
> not be discovered by Buyer until Merchandise shall have been
> purchased by its customers and returned to Buyer.  Buyer's
> inspection, discovery of a breach of warranty, failure to make an
> inspection or failure to discover a breach of warranty shall not
> constitute a waiver of any of Buyer's rights or remedies
> whatsoever.

Id.

Section 5 of the relevant Purchase Orders provides, in part:

> 5.  In the event QVC reasonably determines that any Merchandise
> sold by QVC to its customers contains any defect, QVC may, in its
> sole discretion (taking into account QVC's standards for customer
> satisfaction), subject to applicable law, determine the necessity of a
> voluntary recall or other action (including the determination as to
> whether QVC's customers will be offered a replacement item of
> Merchandise or a refund of their purchase price and shipping and
> handling charges).  The rights of QVC in the foregoing sentence
> shall be in addition to any and all rights of QVC contained in this
> Order.

Jt. Stip. ¶ 15; P-9.  QVC contends that it reasonably determined that the Heaters contained a

defect and that it properly exercised its discretion to recall the Heaters.

In Section 4 of the Purchase Orders, Soleus agreed, inter alia, to hold harmless and

indemnify QVC from and against any "direct, special, incidental, exemplary, and consequential

damages and losses of any kind," specifically including lost profits and reasonable attorneys' fees

"based upon or resulting from . . . any alleged or actual defect" in the Heaters.  Jt. Stip. ¶ 14; P-9.

Section 4 provides, in relevant part:

> 4.  Vendor hereby agrees to protect, defend, hold harmless and
> indemnify Buyer . . . from and against any and all claims, actions,
> suits, costs, liabilities, damages and expenses (including but not
> limited to, all direct, special, incidental, exemplary and
> consequential damages and losses of any kind [including, without

> limitation, present and prospective lost profits and lost business]
> and reasonable attorneys' fees) based upon or resulting from . . .
> (b) any alleged or actual defect in any of the Merchandise . . . [and]
> (d) breach by Vendor of any representations, warranties or
> covenants[.]

Id.

## XI.    QVC's Claimed Damages for the Heaters

At trial, Alan Kujawa, QVC's Vice President of Inventory Accounting testified as to QVC's claimed damages.  Exclusive of prejudgment interest and attorneys' fees, QVC seeks a total of $1,838,855.59 in damages related to the Heaters.  QVC seeks damages for the cost price of the Heaters in addition to lost profits, refunded outbound customer shipping costs, shipping costs for the return of Heater Cords to QVC, refunded customer shipping costs for Heaters returned to QVC, return-to-vendor shipping costs, returns center processing costs and other costs associated with the recall.

### A.    Cost Price Damages

Each Heater had a cost price to QVC of $41.07 – $36.00 to Soleus and $5.07 to third parties for landed costs.  Jt. Stip. ¶ 40.  As set out below, QVC's claimed cost price damages for all of the Heaters at issue in this action is $1,046,176.11.  P-159 at 1.

On July 18, 2011, the Court granted summary judgment in favor of QVC and against Soleus with respect to Soleus's liability to refund QVC for 4,284 customer returned Heaters that QVC shipped to Soleus in February and March 2008 (the "Shipped Customer Return Heaters"). Dkt. No. 50 at 11.  QVC's claimed cost price damages for the Shipped Customer Return Heaters total $175,943.88 – or the cost price of $41.07 multiplied by 4,284.  P-159 at 1; Tr. Day 2 at 102:1-3 (Kujawa).

Summary judgment was also granted in favor of QVC and against Soleus with respect to QVC's right to payment by Soleus for customer returned Heaters still in its possession (the "Unshipped Customer Return Heaters"). Dkt. No. 50 at 13. As of January 8, 2012, QVC had in its inventory 1,824 Unshipped Customer Return Heaters. P-165. QVC's claimed cost price damages for the Unshipped Customer Return Heaters are $74,911.68. P-159 at 1.

As of January 8, 2012, QVC had in its inventory 8,752 Heaters that had never been sold to its retail customers (the "Unsold Heaters."). P-165. QVC's claimed cost price damages for the Unsold Heaters are $359,444.64. P-159 at 1.

Also as of January 8, 2012, QVC had received 10,613 customer returned cords as a result of the recall (the "Heater Cords"). Tr. Day 2 at 102:5-18 (Kujawa). QVC's claimed cost price damages for the Heater Cords are $435,875.91. P-159 at 1.

### B.    Lost Profit

Upon receipt of a Customer Return Heater or a Heater Cord, QVC refunded to its customer the full value that the customer paid to QVC for the Heater. Tr. Day 2 at 104:19-22 (Kujawa). The Today's Special Value® price for the Heaters was $67.86, the lowest per unit price at which QVC offered the Heaters for sale. Id. at 105:5-16. QVC claims that $26.49[11] constituted its profit on the sale of each Heater – profit that QVC would have realized had it not refunded the sales price to its customers. Id. at 104:23-105:4; P-159 at 2. QVC's total claimed lost profit damages for the Heaters or Heater Cords that were returned to QVC are $442,939.29. Id. at 105:17-18; P-159 at 2.

---

[11]    In fact the TSV price of $67.86 less the per-Heater cost price of $41.07 equals $26.79, not $26.49. QVC, however, calculated its lost profits at a rate of $26.49/Heater and I will award damages based on that calculation.

**C.     Refunded Outbound Customer Shipping Costs**

In addition to refunding customers with the full value that they paid for Heaters, all QVC

customers who purchased Heaters from QVC were refunded the full value of the cost they paid to

have the Heater shipped to them when they purchased it from QVC.  Tr. Day 2 at 105:19-106:14

(Kujawa).  QVC's customers paid $8.04 for delivery of Heaters purchased as a Today's Special

Value®.  Id. at 106:2-7.  As damages for refunded outbound customer shipping costs,  QVC

seeks $8.04 for each of the Heaters it sold, as represented by 4,284 Shipped Customer Return

Heaters, 1,824 Unshipped Customer Return Heaters and 10,613 Heater Cords, for a total of

$134,436.84.  P-159 at 2.

**D.     Costs for Heater Cord Returns**

Pursuant to the recall, QVC instructed customers to cut the Heater Cords off of their

Heaters and to send them back to QVC.  P-102.  QVC provided its customers with packaging and

prepaid postage for the Heater Cords at a cost of $2.00 per Heater Cord.  QVC seeks $21,226.00

in damages – $2.00 multiplied by 10,613 Heater Cords – for the shipping costs to return the

Heater Cords to QVC.  Tr. Day 2 at 108:5-21 (Kujawa); P-159 at 3; P-165.

**E.     Refunded Customer Shipping Costs for Heaters Returned to QVC**

QVC customers who returned intact Heaters to QVC (as opposed to just Heater Cords),

were refunded the full value of their cost to ship their Heater back to QVC.  Tr. Day 2 at 107:13-

108:1 (Kujawa).  As damages for refunded customer shipping costs for Heaters returned to QVC,

QVC seeks $8.04 for each of 4,284 Shipped Customer Return Heaters and 1,824 Unshipped

Customer Return Heaters, for a total of $49,108.32.[12]  <u>Id.</u> at 107:24-108:1; P-159 at 3.

### F.    Return-to-Vendor Shipping Costs

Return-to-vendor shipping costs are the estimated shipping costs to return goods back to a

vendor.  QVC calculates this cost on a company-wide basis and expresses the costs as a

percentage of the per-unit cost of merchandise to be shipped.  Tr. Day 2 at 103:7-104:1

(Kujawa).  The cost varies over time because it is an average and reflects the potential savings

that QVC derives from having contracts with shipping carriers.  <u>Id.</u>  In or around 2008, the

return-to-vendor shipping cost to QVC was one percent or, as applied to the Heaters, $0.41 per

Heater.  <u>Id.</u>; <u>see also</u> P-159 at 1.  QVC seeks return-to-vendor shipping cost damages for the

Heaters as follows: $1,756.44 for Shipped Customer Return Heaters – to Soleus; $747.84 for

Unshipped Customer Return Heaters; and $3,588.32 for Unsold Heaters.  P-159 at 1.  QVC's

total claimed return-to-vendor shipping cost damages for Heaters returned or to be returned to

Soleus are $6,092.60.  <u>Id.</u>

### F.    Returns Center Processing Costs

QVC incurs returns center processing costs[13] when its customers return products.  QVC

---

[12]     QVC derived the amount of $8.04 per Heater from the original shipping and
handling fee paid by its customers.  Tr. Day 2 at 107:13-108:1 (Kujawa).  In many instances
QVC refunded to its customers shipping costs in excess of $8.04 per Heater.  <u>Id.</u>

[13]     In its post-trial brief, Dkt. No. 93 at 32, Soleus argues for the first time that QVC
violated Rule 1006 of the Federal Rules of Evidence by not making available materials used to
support QVC's claims for two items listed in exhibit P-159: "return center processing costs" on
all returned and recalled Heaters and "customer service calls."  P-159 at 2-3.  Rule 1006 provides
that a party may use

> a summary, chart, or calculation to prove the content of
> voluminous writings, recordings, or photographs that cannot be
> conveniently examined in court.  The proponent must make the

calculates this cost as a company-wide average by taking the total cost involved with QVC's

returns process by the total number of returns processed by its returns center.  Tr. Day 2 at

106:15-107:6 (Kujawa).  The per unit price for the Heaters for the return center processing cost

was $1.65.  Id.  Summary judgment has been granted in favor of QVC and against Soleus with

respect to Soleus's liability for returns center processing costs for Shipped and Unshipped

Customer Return Heaters.  Dkt. No. 50 at 11, 13.  QVC's claimed returns center processing cost

damages for Shipped Customer Return Heaters are $7,068.60 – or $1.65 multiplied by 4,284.  P-

159 at 2.  QVC's claimed returns center processing cost damages for the 1,824 Unshipped

Customer Return Heaters are $3,009.60.  Id.  For the Heater Cords, QVC's claimed returns center

processing cost damages are $17,511.45.  Id.  QVC's total claimed damages for return center

processing costs for the Heaters are $27,589.65.  Tr. Day 2 at 107:10-12 (Kujawa); P-159 at 2.

---

            originals or duplicates available for examination or copying, or
            both, by other parties at a reasonable time and place. And the court
            may order the proponent to produce them in court.

Fed. R. Evid. 1006.

        At trial, Alan Kujawa, QVC's damages witness referred to exhibit P-159 in his testimony
about how QVC calculated both the returns center processing cost, Tr. Day 2 at 106:18-24
(Kujawa), and the cost of customer service calls.  Id. at 111:2-8.  Soleus made no objection to
Kujawa's testimony or to exhibit P-159 during the trial.

        Rule 103(a)(1) of the Federal Rules of Evidence requires a party to make a "timely
objection."  An objection may be waived, if it is not made as soon as the grounds for the
objection could reasonably have been known.  Gov't of V.I. v. Archibald, 987 F.2d 180, 184 (3d
Cir. 1993); see also Stitch v. United States, 730 F.2d 115, 119 (3d Cir. 1984) (finding that party
waived objection to admissibility of evidence when it failed to object to the admission of a table
summarizing the evidence at trial).  I find that Soleus waived any argument with respect to the
admissibility of the information contained in exhibit P-159.

### H.   Other Recall Costs

QVC seeks $111,286.78 in other costs associated with the recall.  P-159 at 3.  Costs

incurred in conjunction with recalling the Heaters included:  (1) the initial customer notification

letter (12,393 letters at $0.55 each), Tr. Day 2 at 109:6-111:1 (Kujawa); P-11; P-165; P-159 at 3;

(2) customer service calls (26,423 calls at $1.78 per call), Tr. Day 2 at 111:2-18 (Kujawa); P-11;

P-165; P-159 at 3; (3) testing by Intertek, Tr. Day 2 at 111:19-112:8 (Kujawa); P-65; P-159 at 3;

(4) recall letters sent using Provide, Tr. Day 2 at 112:9-113:10 (Kujawa); P-11; p-159;

(5) recorded telephone calls to customers, Tr. Day 2 at 113:11-114:8 (Kujawa); P-11; P-159; and

(6) customer contact letters (Lindemeyr Paper), Tr. Day 2 at 114:9-115:8 (Kujawa); P-11; P-159.

## XII.   The Other Merchandise

From February 13, 2007 to January 8, 2008, QVC issued various purchase orders for the

following products:  (1) SoleusAir Micathermic Ultra Thin Portable Heater (V25162);

(2) SoleusAir 10" Velocity Table/Hall Fan with Adjustable Head (V25871); (3) SoleusAir 16"

Oscillating Stand Fan with Remote Control (V25872); (4) Soleus FC1-38R-21 38" Tower Fan

(H133258); (5) Soleus FTM-25 10" Metal Table Fan (H133264); (6) Soleus FTY-25 10" Table

or Wall Mount Fan (H133266); (7) Soleus CFM-40 Portable Dehumidifier - 40-pt (H133274);

(8) Soleus FC1-42R-03 42" Tower Fan (H133260); (9) Soleus SA-150 Multi-Filter UV Air

Purifier (H133270); and (10) Soleus MW-55 Water Cooler (H133282).  Jt. Stip. ¶ 5.

On July 18, 2011, the Court granted summary judgment in favor of QVC and against

Soleus with respect to Soleus's liability to refund QVC for both Soleus merchandise other than

Heaters that had been returned by QVC's customers and then sent to Soleus – the Shipped Other

Merchandise and Soleus merchandise other than Heaters returned by QVC's customers and not

-36-

sent to Soleus – the Unshipped Other Merchandise.  Dkt. No. 50 at 11, 13.  QVC's claimed

damages relating to the Other Merchandise include the cost price, return to vendor shipping costs

and return center processing costs.

QVC and Soleus have stipulated as to the purchase price of the Other Soleus

Merchandise.  Jt. Stip. ¶ 4.  With respect to the Shipped Other Merchandise, QVC's claimed cost

price damages total $101,321.50.  P-159 at 4-5; Tr. Day 2 at 116:10-117:1 (Kujawa).  QVC's

claimed cost price damages for the Unshipped Other Merchandise total $49,263.17.  P-159 at 4;

P-165 (number of items in inventory as of January 8, 2012); Tr. Day 2 at 115:15-116:9 (Kujawa).

QVC's claimed return to vendor shipping costs for the Other Merchandise are $1,530.12.  P-159

at 5-6; Tr. Day 2 at 117:2-14 (Kujawa).  QVC's claimed return center processing costs for the

Other Merchandise are $6,157.80.  P-159 at 6-7; Tr. Day 2 at 117:15-118:6 (Kujawa).  In total,

QVC's claimed damages for the Other Merchandise are $158,272.59.  P-164 at 7.

On December 13, 2011, QVC reasserted its right to return Other Merchandise still in its

inventory.  Jt. Stip. ¶ 38; P-128

## XIII.  Offset to Soleus

QVC and Soleus have stipulated that

> any amount in damages awarded to QVC shall be offset by
> $315,321.34 for vendor credits (which sum includes the aggregate
> value of Soleus's Counterclaim) (the "Offset Amount").  The
> Offset Amount includes all amounts due and owing to Soleus and
> Soleus is not entitled to any further damages or offset against
> QVC's claims in this litigation except for the Offset Amount.

Jt. Stip. ¶ 42.[14]

---

[14]     "Both sides were given ample amount of time to reach said agreement and both
sides compromised for the sake of judicial economy." Baker v. Chrysler Corp., No. 91-7092,

## CONCLUSIONS OF LAW

### I.     Breach of Contract

To succeed on its breach of contract claims under Pennsylvania law, QVC must establish, by a preponderance of the evidence, "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003), quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999). There is no dispute that a contract, with essential terms, existed between the parties. Further, on summary judgment the Court determined that Soleus is liable to QVC for the breach of its obligation to refund QVC for the Shipped and Unshipped Customer Return Heaters and for the Shipped and Unshipped Other Merchandise. Dkt. Nos. 50, 51 and 57.

Still remaining for resolution after trial are the following questions. First, whether certain Heaters were defective such that Soleus breached the representations, warranties and covenants set forth in Section 3 of the Purchase Orders. If so, QVC was entitled to return the Heaters to Soleus for a refund in accordance with Section 7 of the Purchase Orders.[15] Second, whether, in accordance with Section 5 of the Purchase Orders, QVC reasonably determined that the Heaters contained a defect. If so, QVC was entitled to, in its sole discretion, determine that it should conduct a voluntary recall of the Heaters and Soleus is in breach of its obligations to indemnify QVC under Section 4 of the Purchase Orders for the costs associated with the recall.

---

1993 WL 18099, at *10 (E.D. Pa. Jan. 25, 1993) (refusing to amend the amount of an award to the plaintiff where the award was reached by stipulation of counsel).

[15]     I previously held that if the evidence at trial were to establish that "the unsold heaters could have been returned to Soleus under Section 7, then Soleus breached its obligations to QVC under Section 7 with respect to the unsold heaters in failing to prepay QVC's requested refund for the unsold heaters." Dkt. No. 50 at 16.

### A.       Implied Duty of Good Faith and Fair Dealing

As an initial matter, I find that an implied duty of good faith and fair dealing cannot be used to impose on QVC obligations outside of those set forth in the Purchase Orders.  Under Pennsylvania law, "'[i]t is firmly settled that the intent of the parties to a written contract is contained in the writing itself.'"  Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir. 1995), quoting Samuel Rappaport Family P'ship v. Meridian Bank, 657 A.2d 17, 21 (Pa. Super. Ct. 1995) (internal quotations omitted).  "[C]ourts generally utilize the good faith duty as an interpretive tool to determine the parties' justifiable expectations, and do not enforce an independent duty divorced from the specific clauses of the contract."  Duquesne, 66 F.3d at 617 (quotation omitted).

Thus, the question before me is not whether QVC could have done more to involve Soleus in QVC's investigation of and ultimate determination as to whether the Heaters contained a defect or in QVC's decision to recall the Heaters.  Nor is the question whether QVC could have taken additional steps to limit the scope of the Heater recall.  Instead, the relevant question is whether QVC was required to do so given the terms of its agreements with Soleus.  I find that it was not.  The implied duty of good faith and fair dealing cannot be used to create such an obligation.  Indeed, Section 5 of the Purchase Orders explicitly provides that QVC was entitled to make such a determination "in its sole discretion" after making a reasonable determination that any Heaters sold to its customers contained any defect.  Jt. Stip. ¶ 15.

In its post-trial filings, Soleus faults QVC for not having a "procedure in place to allow it to quickly isolate health and safety related product returns in its returns warehouse."  Dkt. No. 93 at 20.  As McGrath conceded at trial, such a procedure "would have been a good idea, yes."  Tr.

Day 1 at 123:12 (McGrath).  But the Purchase Orders did not obligate QVC to have such a procedure in place and an implied duty of good faith and fair dealing cannot be used to create such a duty.

Soleus also contends that QVC "should have used its complaint and return data processes to collect [serial number] information and provide it to Soleus . . . ."  Dkt. No. 93 at 20.  Soleus asserts that in failing to do so, QVC breached its duty of good faith.  Again, the Purchase Orders did not obligate QVC to provide Soleus with serial number information prior to making its recall determination and the implied duty of good faith cannot be used to create such a duty.  Further, Soleus never asked QVC for serial number information.  In addition, prior to QVC's recall determination, QVC provided Soleus with access to the serial numbers of eight customer-returned Heaters obtained by QVC.  P-30 at QVC-06-00113; QVC-06-00124; P-37.  Soleus also had access to the serial numbers on the Shipped Customer Return Heaters.[16]

To read into the Purchase Orders a duty of "good faith" on the part of QVC that required it to defer to Soleus or to modify its returns procedure or to provide Soleus with serial numbers

---

[16]     When asked what Soleus had done with the returned units, Jimmy Loh testified that:

> That's what we usually do because to us, we didn't think that returned units contained any serious problem (indiscern.) units. QVC is a much bigger and a strong company, and we assume they have a much better customer service system where they separate those serious problem (indiscern.) have a major concern that units (indiscern.) the rest of the returns.  So when we received the returns, we considered that's a normal return from QVC.  We counted them and looked (indiscern.) make sure (indiscern.) shipped out and usually we (indiscern.) dispose it through our normal course of business.

Tr. Day 4 at 108:14-24 (J. Loh).

"would not 'utilize the good faith duty as an interpretive tool to determine the parties' justifiable expectations'; rather, it would 'override the parties' agreement for reasons of fairness, policy or morality."  Pierce v. QVC, Inc., 555 F. Supp. 2d 499, 504 (E.D. Pa. 2008), quoting Duquesne , 66 F.3d at 617.

### B.    Soleus Breached the Warranties Set Forth in the Purchase Orders

In Section 3 of the Terms and Conditions of the Purchase Orders, Soleus represented and warranted to QVC that "all Merchandise . . . shall be free from all defects (including latent defects) in workmanship, material and design[.]"  Jt. Stip. ¶ 13 (emphasis added).  This warranty is "[i]n addition to and without prejudice to any and all other warranties, express or implied by law."  Id.  Under Pennsylvania law, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise."  13 Pa. Cons. Stat. § 2313(a).  Further, the implied warranty of merchantability requires that goods "have an inherent soundness which makes them suitable for the purpose for which they are designed." Gall v. Allegheny Cnty. Health Dep't, 555 A.2d 786, 789-90 (Pa. 1989).

> Goods to be merchantable must be at least such as: (1) pass
> without objection in the trade under the contract description; . . .
> (3) are fit for the ordinary purposes for which such goods are used;
> [and] (4) run, within the variations permitted by the agreement, of
> even kind, quality and quantity within each unit and among all
> units involved . . . .

13 Pa. Cons. Stat. § 2314(b).

To determine whether Soleus is in breach of the warranties set forth in Section 3 of the Purchase Orders, I must consider whether the evidence at trial supports a finding that certain

Heaters were defective.  I find that it does.

In its Pretrial memorandum, Soleus represented that "the heaters were not defective, and that QVC's recall violated the terms of the purchase orders."  Dkt. No. 64 at 3.  A different story emerged at trial.  Soleus's expert admitted that certain Heaters suffered from a latent defect, one that consumers would be unable to detect before actual overheating, melting, smoke or fire had occurred.  Tr. Day 5 at 13:12-14:1 (Ebersole).  QVC's expert agreed that the Heaters contained a manufacturing defect in the nature of a poor wire crimp connection in their wiring compartment.  Tr. Day 3 at 23:7-23:15 (Bills).  In its post-trial brief, Soleus concedes that "[a]t trial, all of the parties' experts agreed that the cause of the overheating observed in damaged units was likely due to a 'crimping error' on the orange-colored wire that connected to 'Terminal A' on the thermostat of the Heater. . . . [A]ny crimping error would constitute a manufacturing defect."[17]

---

[17]     Despite this admission, in its post-trial brief, Soleus seeks "an inference that, at the time of the recall all of the Heaters remaining in the field contained no defects, that there was no justification for recalling them, and that a proper investigation by QVC would have disclosed this fact."  Dkt. No. 93 at 30.  Soleus argues, for the first time, that it is entitled to such an inference as a sanction for "QVC's intentional spoliation of evidence," id. at 28, because QVC's instruction to its customers to cut the cords off of the recalled Heaters "deprived [Soleus] of critical evidence that could have shown what could have been learned by QVC and Soleus about the nature and extent of any defect prior to the recall."  Id. at 30.  Soleus makes this argument notwithstanding Jimmy Loh's deposition testimony that Soleus itself destroyed Heaters that were returned to QVC by its customers and then shipped to Soleus in February and March 2008.  J. Loh Dep. at 123:24-124:9.  I find that Soleus's requested inference is unwarranted.

First, Rule 103(a)(1) of the Federal Rules of Evidence requires a party to make a "timely objection."  As QVC argues, "Soleus has waived its spoliation argument by failing to raise this issue prior to or during trial."  Dkt. No. 98 at 20.  See Archibald, 987 F.2d at 184 (3d Cir. 1993).  Further, in determining whether a spoliation sanction is appropriate, I must consider whether QVC "intended to impair the ability of the other side to effectively litigate its case."  Paramount Pictures Corp. v. Davis, 234 F.R.D. 102, 111 (E.D. Pa. 2005).  Soleus has not offered any evidence that QVC instructed its customers to cut off the Heater Cords for any reason other than to protect its customers from what it perceived to be a potential health and safety risk posed by the Heaters.  See Tr. Day 1 at 113:16-114:23; 115:6-20 (McGrath).  Indeed, the mechanics of the recall were approved by the CPSC, Tr. Day 2 at 162:14-23 (Gidding).

Dkt. No. 93 at 18.  After trial, there is no question that certain of the Heaters contained a

manufacturing defect.

Soleus contends, however, that to prevail on its claims QVC was obligated to determine

the scope of the intermittent manufacturing defect.  Dkt. No. 97 at 9-11.  I disagree.  See

Blommer Chocolate Co. v. Bongards Creameries, Inc., 644 F. Supp. 234, 237 (N.D. Ill. 1986)

(holding that "when a defendant can only charge a plaintiff with failure to discover a defect,

plaintiff's conduct is ordinarily not a defense against warranty liability . . . If the defective

product was put to its normal use, a plaintiff's failure to inspect could supersede the breach of

warranty as the cause of damage only if the defect was blatantly obvious beforehand, so that even

a cursory visual inspection would have revealed it.").  For QVC to recover against Soleus under

Section 3 of the Purchase Orders, it was enough for QVC to establish that some subset of the

Heaters suffered from latent manufacturing defects.  See 13 Pa. Cons. Stat. § 2314(b)(4) ("Goods

to be merchantable must be at least such as: . . . run, within the variations permitted by the

agreement, of even kind, quality and quantity within each unit and among all units

involved . . . .") (emphasis added).  By supplying Heaters to QVC with defective crimp

connections, Soleus broke its promise to QVC that all of the Heaters would be free from all

defects, including latent defects.  QVC was not obligated to prove that all of the Heaters were

defective to prevail on its breach of warranty claims and its breach of warranty claims are not

limited to those Heaters with actual defects.

Because I find that Soleus breached the warranties set forth in the Purchase Orders, I find

that QVC was entitled to return all of the Heaters to Soleus for a refund under Section 7 of the

Purchase Orders, regardless of whether they were sold or unsold.[18]   QVC requested a refund for

the Heaters on April 8, when it wrote to Soleus that it was revoking its acceptance of the Heaters.

P-103.  QVC was entitled "to require a full refund prior to the return of" the Heaters.  Jt. Stip.

¶ 16.  Soleus failed to refund QVC for the Heaters "in immediately available funds within fifteen

(15) days of QVC's request" in breach of its obligations under Section 7 of the Purchase Orders.

Id.

### C.   QVC Was Entitled to Recall the Heaters

I find that QVC reasonably determined that the Heaters contained a defect.  Section 5 of

the Purchase Orders provides that

> [i]n the event QVC reasonably determines that any Merchandise
> sold by QVC to its customers contains any defect, QVC may, in its
> sole discretion (taking into account QVC's standards for customer
> satisfaction), subject to applicable law, determine the necessity of a
> voluntary recall or other action (including the determination as to
> whether QVC's customers will be offered a replacement item of
> Merchandise or a refund of their purchase price and shipping and
> handling charges).

Jt. Stip. ¶ 15.

Section 1115.4 of the regulations under the Consumer Product Safety Act ("CPSA")

provides guidance as to what constitutes a defect.  A defect is defined as

> a fault, flaw, or irregularity that causes weakness, failure, or
> inadequacy in form or function.  A defect, for example, may be the

---

[18]    Because I find that the Unsold Heaters could have been returned to Soleus under
Section 7 of the Purchase Orders, I need not decide whether: (a) QVC had reasonable grounds for
insecurity such that it was entitled to demand adequate assurances under 13 Pa. Cons. Stat. Ann.
§ 2609 in the form of payment from Soleus prior to sending the Merchandise to Soleus; or
(b) whether Soleus offered adequate assurances of payment.  Likewise, I need not decide whether
QVC is entitled to return some portion of the Unsold Heaters to Soleus for a refund under
Section 8 of the Purchase Orders.

result of a manufacturing or production error; that is, the consumer product as manufactured is not in the form intended by, or fails to perform in accordance with, its design.

16 C.F.R. § 1115.4.  As an example, the regulation notes that "a defect as a result of manufacturing or production error" is present in "[a]n electric appliance [that] presents a shock hazard because, through a manufacturing error, its casing can be electrically charged by full-line voltage."  Id.  The evidence presented at trial demonstrated that certain of the Heaters contained a similar "fault, flaw or irregularity" that clearly falls within the definition of a defect – an inadequate crimp connection in a salmon colored wire.  Heaters containing the inadequate crimp connection were subject to overheating and, when overheated, insulation on wires inside the units could melt, smoke or catch fire.

QVC's determination that the Heaters contained a defect was reasonable in light of the information available to QVC at the time of its decision to recall the Heaters including:  (1) an unusually high number of complaints from customers that the Heaters they had purchased were smoking, sparking, emitting odors or flames, and/or had melted control panels; (2) Fitzgerald's finding after an examination of a number of customer-returned Heaters that the same salmon-colored wire was melted, discolored or severed in each damaged Heater; and (3) Intertek's findings after evaluating four customer-returned Heaters, including Intertek's observation that "there is clearly shorting of live parts to ground and ignition of plastic which may or may not have caused flames to leave the enclosure" and its conclusion that poor quality crimp connections could be a cause of overheating.  D-22 at 14-15.

Soleus contends that QVC's determination that the Heaters contained a defect was unreasonable because QVC did not investigate whether the crimping errors could be isolated to a

particular batch.  I disagree. The regulations under the CPSA provide that "[e]ven one defective product can present a substantial risk of injury and provide a basis for a substantial product hazard determination under section 15 of the CPSA[19] if the injury which might occur is serious and/or if the injury is likely to occur."  16 C.F.R. § 1115.12(g)(ii).  Clearly a serious injury might occur if a Heater were to emit smoke or flames inside of a consumer's residence.

Because I find that QVC reasonably determined that certain of the Heaters contained a defect, QVC was entitled to exercise its discretion to participate in the CPSC's Fast Track recall program for the Heaters where QVC had high standards for customer satisfaction and where its customers had purchased Heaters subject to a latent manufacturing defect that could result in fire.

## III.    Damages[20]

### A.    Damages Related to the Heaters

#### 1.    QVC Mitigated its Heater Related Damages

In considering an appropriate award of Heater related damages to QVC, I begin by rejecting Soleus's contention that QVC failed to mitigate its damages.  Soleus suggests that the Heaters could have been isolated into production lots and that the scope of the manufacturing

---

[19]    The CPSA defines a "substantial product hazard," in part, as a "product defect which (because of the pattern of defect, the number of defective products distributed in commerce, the severity of the risk, or otherwise) creates a substantial risk of injury to the public." 15 U.S.C. § 2064(a)(2).  Under the CPSA QVC was required to provide immediate notice to the CPSC when it obtained information that reasonably supported a conclusion that the Heaters contained a defect that could create a "substantial product hazard."  15 U.S.C. 2064(b)(3).

[20]    In Counts IV, VI, VIII and XII of its Complaint, QVC asks the Court for specific performance of its rights under the Purchase Orders, including its rights to return the Unsold and Unshipped Heaters and Unshipped Other Merchandise remaining in its inventory.  Dkt. No. 1. To the extent that QVC intends to return such merchandise to Soleus, QVC is entitled to do so under the terms of the Purchase Orders and I will Order Soleus to accept return of such merchandise.

defect could have been contained.  Under Pennsylvania law, a defendant has a duty to mitigate

those "damages which the plaintiff might have avoided with reasonable effort without undue

risk, expense, or humiliation" and that "are either not caused by the defendant's wrong or [that]

need not have been, and therefore are not to be charged against him."  Toyota Indus. Trucks

U.S.A., Inc. v. Citizens Nat'l Bank of Evans City, 611 F.2d 465, 471 (3d Cir. 1979) (citation and

internal quotation omitted).  "When mitigation is appropriate, the test to be applied to the

plaintiff's conduct is whether the conduct taken in response to the defendant's breach was

reasonable."  Id.

  QVC's conduct was reasonable when considering that it had no contractual obligation to

isolate a subset of potentially defective Heaters and where Soleus denied the existence of any

defect.  Soleus's sales middlemen[21] had discussions amongst themselves about the "need to

'designate' a lot number" associated with the Heaters that had wiring issues and to "contain the

issue to a certain number of units" by "isolat[ing] a 'batch' that [Soleus] could offer to be

returned or reworked."  P-46.  The idea of a batch-limited recall was, however, never mentioned

to QVC.  Once Soleus had notice that QVC intended to pursue a recall of the Heaters, Soleus did

not request from QVC any information that would have helped it to narrow the number of

Heaters subject to recall.  Further, Soleus has not put forth any evidence to support a conclusion

---

[21]  In Soleus's response to QVC's proposed findings of fact and conclusions of law, it contends that "these salesmen had no responsibilities for evaluating the Heater returns and formulating a technical response concerning those Heaters.  These functions were wholly outside the scope of their agency . . . .  Rather, their role was limited to sales, minor customer service issues, and facilitating communications between Soleus QVC."  Dkt. No. 97 at 12.  Soleus, however, presented no evidence at trial that any Soleus employees other than Charley Loh were actively engaged in "formulating a technical response" to the Heater issues.  Indeed, the only evidence of Soleus's "technical response" to the Heater issues was its decision to ship Heaters to Ningbo Bole for evaluation.

that the wire-crimping problem was in fact limited to an identifiable subset of the Heaters.  I find

that Soleus has not met its burden of proving QVC's failure to mitigate.

### 2.     Damages for Breach of the Heater Purchase Orders

QVC is entitled to recover the costs it incurred as a result of the sale by Soleus of

defective Heaters – including the costs to conduct the recall – because Soleus breached the

warranties set forth in the Purchase Orders and because QVC was entitled to conduct a voluntary

recall of the Heaters.

Under Section 7 of the Purchase Orders, QVC was entitled to "receive a credit or refund

equal to the average cost of amounts paid by [QVC] for each [Heater], including, without

limitation, in-bound freight charges . . . ."  Jt. Stip. ¶ 16.  Section 7 also provides that "[a]ll

expense of unpacking, examining, repacking, storing, returning and reshipping any Merchandise

rejected (or acceptance of which has been revoked) . . . shall be at [Soleus's] expense and risk."

Jt. Stip. ¶ 16.

Section 4 of the Purchase Orders provides, inter alia, that Soleus would

> protect, defend, hold harmless and indemnify [QVC] . . . from and
> against any and all claims, actions, suits, costs, liabilities, damages
> and expenses (including but not limited to, all direct, special,
> incidental, exemplary and consequential damages and losses of any
> kind [including, without limitation, present and prospective lost
> profits and lost business] and reasonable attorneys' fees) based
> upon or resulting from (b) any alleged or actual defect in any of the
> [Heaters] . . .[and] (d) breach by [Soleus] of any representations,
> warranties or covenants[.]

Jt. Stip. ¶ 14; P-9 (bracketed alterations in Jt. Stip.).

Further, under the UCC, as adopted in Pennsylvania, incidental damages "include (1)

expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods

rightfully rejected; (2) any commercially reasonable charges, expenses or commissions in connection with effecting cover; and (3) any other reasonable expense incident to the delay or other breach." 13 Pa. Cons. Stat. Ann. § 2715(a). Consequential damages include: "(1) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (2) injury to person or property proximately resulting from any breach of warranty." Id. § 2115(b).

I find that QVC has met its burden to pass the costs of the recall along to Soleus. Soleus was aware when it entered into the Purchase Orders that QVC was reselling the Heaters to its customers and that QVC retained the right to conduct a recall of the Heaters in the event of a breach of warranty. "[I]n an appropriate case, where the record supports the logic and reasonability of costs of same, this element of damages should be allowed." In re Repco Products Corp., 100 B.R. 184, 200 (Bankr. E.D. Pa. 1989); see also United Cal. Bank v. Eastern Mountain Sports Inc., 546 F. Supp. 945, 970–71 (D. Mass. 1982) (finding costs of recall campaign necessitated by seller's breach of contract were recoverable as consequential damages where seller had reason to know of buyer's standards), aff'd without op., 705 F.2d 439 (1st Cir. 1983).

Costs that QVC is entitled to recover include cost-price damages, lost profits, refunded outbound customer shipping costs, the cost of the Heater cord returns, refunded customer shipping costs for Heaters returned to QVC, return-to-vendor shipping costs, returns center processing costs and other recall costs. Accordingly, and because Soleus did not offer evidence at trial to rebut the damages evidence set forth by Kujawa, QVC's damages expert, I will award

Heater related damages to Soleus in the following amounts:

(1)     Cost Price Damages:  $1,046,176.11

(2)     Lost Profit:  $442,939.29

(3)     Outbound Customer Shipping Costs:  $134,436.84

(4)     Heater Cord Returns:  $21,226.00

(5)     Customer Shipping Costs for Heaters Returned to QVC: $49,108.32

(6)     Return to Vendor Shipping Costs:  $6,092.60

(7)     Returns Center Processing Costs:  $27,589.65

(8)     Costs of the Recall: $111,286.78

TOTAL HEATER RELATED DAMAGES:  $1,838,855.59

## B.     Damages Related to the Other Merchandise

On July 18, 2011, the Court granted summary judgment in favor of QVC and against Soleus with respect its liability for breach of its obligations under Section 7 of the Purchase Orders for the Shipped and Unshipped Other Merchandise.  Dkt. No. 50 at 11, 13.  As is further elaborated above, QVC set forth evidence at trial to support a finding that it is owed damages for the Shipped and Unshipped Other Merchandise.  Under Section 7 of the Purchase Orders, QVC was entitled to "receive a credit or refund equal to the average cost of amounts paid by [QVC] for each [item of Other Merchandise], including, without limitation, in-bound freight charges . . . ." Jt. Stip. ¶ 16.  Section 7 also provides that "[a]ll expense of unpacking, examining, repacking, storing, returning and reshipping any Merchandise rejected (or acceptance of which has been revoked) . . . shall be at [Soleus's] expense and risk."  Jt. Stip. ¶ 16.

Soleus did not offer evidence at trial to rebut the damages evidence set forth by Kujawa.

Accordingly, I will award Other Merchandise related damages to Soleus in the following amounts:

>   (1)   Shipped Other Merchandise Cost Price Damages:  $101,321.50
>
>   (2)   Unshipped Other Merchandise Cost Price Damages:  $49,263.17
>
>   (3)   Return to Vendor Shipping Costs:  $1,530.12
>
>   (5)   Returns Center Processing Costs: $6,157.80
>
>   TOTAL OTHER MERCHANDISE RELATED DAMAGES: $158,272.59

### C.   Offset

QVC is entitled to a total award of $1,997,128.18 in damages for the Heaters and Other Merchandise.  The amount owed to QVC by Soleus will be offset by the Offset Amount of $315,321.34, the stipulated amount that Soleus owes to QVC, for a total of $1,681,806.84 in damages, absent attorneys' fees and prejudgment interest.

## IV.   Attorneys' Fees

Because I find that Soleus has breached its obligations to QVC under terms of the Purchase Orders, I also find that Soleus is liable for QVC's reasonable attorneys' fees resulting from such breach.  I will withhold judgment with respect to the amount of QVC's attorneys' fees, because such fees have yet to be fixed.  Accordingly, QVC may submit an application in support of the reasonable attorneys' fees it has incurred in prosecuting its claims against Soleus.  QVC must "submit evidence supporting the hours worked and rates claimed."  Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).

## V.   Liability for Prejudgment Interest

Under Pennsylvania law, a plaintiff is entitled to interest on money owed under contract

as a matter of legal right beginning when an obligation to pay arises.  See Fernandez v. Levin,

548 A.2d 1191, 1193 (Pa. 1988) (holding the prevailing party's "right to interest begins at the

time payment is withheld after it has been the duty of the debtor to make such payment."); see

also Restatement of Contracts § 337(a).  "The basic premise underlying the award of

prejudgment interest to a party centers on the fact that the breaching party has deprived the

injured party of using interest accrued on money which was rightfully due and owing to the

injured party."  Widmer Eng'g, Inc. v. Dufalla, 837 A.2d 459, 469 (Pa. Super. Ct. 2003).

Pennsylvania has adopted the Second Restatement of Contracts § 354 (1981), which

provides:

> (1) If the breach consists of a failure to pay a definite sum in
> money or to render a performance with fixed or ascertainable
> monetary value, interest is recoverable from the time for
> performance on the amount due less all deductions to which the
> party in breach is entitled.
>
> (2) In any other case, such interest may be allowed as justice
> requires on the amount that would have been just compensation
> had it been paid when performance was due.

Restatement (Second) of Contracts § 354 (1981) (emphasis added); see Fernandez, 548 A.2d at

1193.  As it does not appear that the parties have by contract determined otherwise prejudgment

interest should be calculated at the statutory rate of 6 percent per annum.  41 P.S. § 202 and 42

Pa. Cons. Stat. Ann. § 8101.

Because I find that Soleus breached its obligations under the Purchase Orders with

respect to the Heaters and the Shipped and Unshipped Other Merchandise, I find that Soleus is

liable to QVC for prejudgment interest with respect to QVC's damages.

QVC's right to interest for damages related to the Heaters arose when QVC demanded a

refund for the Heaters on April 8, 2008.  P-103.  With respect to the Other Merchandise, QVC's right to prejudgment interest for the Shipped Other Merchandise arose when it shipped such Merchandise back to Soleus on the dates set forth in Defendant's Exhibit 33, the Affidavit of Alan Kujawa in support of Plaintiff and Counterclaim-Defendant QVC Inc.'s Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 on Counts VII, IX, and XI of Plaintiff's Complaint.  D-33 at ¶ 6; see also P-10.  QVC triggered its right to prejudgment interest for any unshipped customer returned units of the SoleusAir Micathermic Ultra Thin Portable Heater bearing QVC item number V25162 on April 11, 2008, when QVC demanded a refund for the ultra thin heaters in a letter to Charley Loh.  P-104.  Finally, absent proof of a demand from QVC that Soleus accept the return of any remaining Other Unshipped Merchandise prior to the filing of the instant action, I find that QVC's right to interest for any remaining Other Merchandise arose on August 12, 2008, when QVC filed the instant action against QVC.

I will withhold judgment as to the amount of prejudgment interest owed to QVC.  QVC may submit to the Court a proposed calculation of the appropriate amount of prejudgment interest.

## VII.   QVC's Liability to Soleus

Soleus seeks an award of fees, costs, and disbursements, incurred in connection with litigating their counterclaims.  Dkt. No. 97 at 16.  Because Soleus did not sustain its burden of proof on its counterclaims, I find that Soleus is not entitled to recover its attorneys' fees or costs.

An appropriate Order and Judgment follows.